**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETROLEOS MEXICANOS and PEMEX-REFINACION <br><br> Plaintiffs, <br><br> v. <br><br> SK ENGINEERING & CONSTRUCTION CO. LTD. and SIEMENS AKTIENGESELLSCHAFT <br><br> Defendants. | **12 Civ. 9070 (LLS)** <br><br> **ECF CASE** |

## AMENDED COMPLAINT

Plaintiffs Petróleos Mexicanos ("Petroleos") and Pemex-Refinación ("PREF") ("collectively "PEMEX") file their amended complaint against Siemens Aktiengesellschaft ("Siemens") and SK Engineering & Construction Co. Ltd ("SKEC") and in support state:

## INTRODUCTION

This is an action to recover damages relating to Defendants' violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 and 1964, through a pattern of mail and wire fraud. Defendants were awarded a contract to participate in an oil refinery modernization project in Mexico. Defendants obtained financing through the issuance of bonds collateralized by the contract between PEMEX and CONPROCA for the modernization of the refinery located in Cadereyta, Mexico. The bonds were registered with the Securities and Exchange Commission ("SEC") in the U.S. After commencing work, Defendants demanded the payment of tens of millions of dollars beyond their original contract bid price to cover alleged cost overruns. To secure these extra, unauthorized payments, individuals at CONPROCA

fraudulently caused PEMEX to transfer millions of dollars to CONPROCA's bank account in New York.  As a consequence, Plaintiffs suffered millions of dollars in damages.

## PARTIES AND RELEVANT NON-PARTIES

### Plaintiffs

1.      Plaintiffs Petroleos and PREF are decentralized public entities of the federal government of the United Mexican States.  Petroleos is Latin America's largest company and Mexico's chief economic engine.  It is one of the few oil companies in the world involved in all aspects of exploration, distribution, and commercialization of its products.

2.      Plaintiff PREF is a subsidiary of Petroleos which processes, transports, and markets a wide range of products derived from crude oil, including gasoline, jet fuel, diesel fuel, oil, asphalts, liquefied petroleum gas, lubricants, and other refined oil products.

### RICO Defendants

3.       The defendants listed in paragraphs 4 and 5 are the persons who have conspired to engage in a pattern of racketeering activity and each one has participated in the operation or management of the criminal enterprise.  These defendants shall be referred to as the "RICO Defendants."

4.      Defendant Siemens is incorporated and has its principal place of business in Munich, Germany.  Siemens is a global conglomerate that actively participates in the energy, infrastructure, industry, and healthcare sectors, among others.  On December 15, 2008, Siemens plead guilty to conspiring to commit violations of the U.S. Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, *et seq.*, in *U.S. SEC vs. Siemens AG*, Case No. 1:08-cv-02167 (S.D.N.Y.).  Siemens agreed to pay a precedent-setting $1.6 billion penalty to U.S. and European authorities to settle charges that it routinely used bribes and slush funds to secure massive public works

contracts around the world, including refinery modernization projects in Mexico. As relevant here, the SEC's complaint alleged that Siemens systematically bribed PEMEX officials to win lucrative contacts involving oil refinery modernization projects. [DE-1].

5.      Defendant SKEC is incorporated and has its principal place of business in Seoul, Korea. SKEC is one of the largest conglomerates in Korea and actively participates in the energy, housing, architectural, infrastructure, and telecommunications sectors, among others. Several officers of SKEC were imprisoned in Korea in 2003 due to irregularities in the worldwide management of the company, including corruption.

### Non-Party Co-Conspirators

6.      Certain other non-party individuals played roles, direct or indirect, in the scheme to defraud Plaintiffs:

a.      Jaime Federico Said Camil Garza signed a representation agreement with Siemens to allegedly sell Siemens equipment to several public institutions. Upon information and belief, Camil Garza received three separate illicit payments for a total of $2.6 million, for his assistance in settling the cost overrun claims in connection with refinery modernization projects in Mexico.

b.      Eduardo Vergara Cabrera, Projects Subdirector at PREF, authorized the payment of invoices that caused Plaintiffs to be defrauded.

c.      Maximo Tellez Rosas, Project Manager at PREF, authorized the payment of invoices that caused Plaintiffs to be defrauded.

d.      Luis Enrique Bouchot, Counsel at PREF, allowed the payment of the invoices that caused Plaintiffs to be defrauded.

e.  Cesar Nava Vazquez, General Counsel at PEMEX, prevented PEMEX from receiving $102,800,000.00 as compensation for CONPROCA's contract violations. CONPROCA's delays in the Cadereyta Project in violation of the contract schedule triggered the contract guarantees. Accordingly, PEMEX undertook to cash two of the letters of credit, payable at sight, for a total of $102,800,000.00. To that end, Lucia Munive, a PEMEX official, traveled to Seoul, South Korea, in May, 2002. Munive was stopped at the Seoul airport, South Korea, by a courier who delivered a message. The message stated that pursuant to new instructions from Nava Vazquez, Munive was not to cash the letters of credit. Indeed, Munive was told that if she proceeded to attempt to present the letter of credit, she would not only be fired, but also criminally prosecuted.

## SUBJECT MATTER JURISDICTION AND VENUE

7.  This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because plaintiffs' RICO claims arise under the laws of the United States.

8.  Furthermore, the parties' contractual agreements recognized and acknowledged that the payments to CONPROCA would be made through a New York based trust – the PEMEX Project Funding Master Trust – operated by a New York based Trustee at a New York based bank – the Bank of New York – using a bank account located in New York.

9.  Venue is proper here because 18 U.S.C. § 1965(a) permits suit in any district where a defendant has an agent or transacts its affairs. Venue is also proper pursuant to 18

U.S.C. § 1965(b), which permits an action against multiple defendants to proceed in a single district if the ends of justice require it.

## PERSONAL JURISDICTION

10.     This Court has personal jurisdiction over Siemens because it conducts substantial and continuous business in New York.   Siemens lists its stock (in the form of American Depositary Receipts) on the New York Stock Exchange, utilizes New York based attorneys, press agents, and other agents in connection with its securities offerings and filings, as well as its many thousands of U.S. patent applications, and promotes and sells its products through its website and other advertising channels in the U.S. According to Siemens' website[1], the U.S. is its largest regional market.   Siemens has also previously filed suit in the U.S., including in New York.

11.     This Court also has personal jurisdiction over Siemens because it owns 100% of a U.S. subsidiary, Siemens Corporation, which is Siemens' agent in the U.S.   Siemens Corporation conducts the same activities that Siemens would conduct in the U.S.   It sells essentially the same portfolio of goods and services and promotes the global Siemens brand.

12.     This Court has personal jurisdiction over SKEC because it has expressly waived any challenge to personal jurisdiction.  *See* [DE-12-P-2-Fn-1] ("CONPROCA and SKEC do not contest personal jurisdiction for purposes of this case only so that the Complaint can be immediately addressed and dismissed.").   Furthermore, SKEC has continuous and systematic contacts with the U.S., including opening offices in Irvine, California and Houston, Texas. In its

---

[1]     Available at http://www.usa.siemens.com (last visited on May 8, 2013).

2011 Annual Report[2], SKEC stated that it intends to "adopt a market coverage expansion strategy in the U.S." and to engage in a "Total Solution Provider" business model in the U.S. in order to substantially increase its annual revenues.

## GENERAL ALLEGATIONS

### The Refinery Modernization Project

13.     In 1996, PEMEX sought bids from contractors interested in performing work on the modernization and expansion of the Hector R. Lara Sosa Refinery located in the Cadereyta Jimenez municipality, Nuevo Leon State, Mexico (the "Cadereyta Project").

14.     After the initial technical review, only two proposals remained. CONPROCA – the joint venture between SKEC and Siemens[3] specifically created for the Cadereyta Project– submitted one of the remaining bids. A consortium led by Mitsubishi Co/Mitsui (the "Mitsubishi Consortium"), submitted the second and only other proposal that qualified.

15.     CONPROCA and the Mitsubishi Consortium submitted their economic proposals in November 1997. CONPROCA proposed a semi-annual payment for PEMEX of $123,067,000. The Mitsubishi Consortium, in sharp contrast, requested $222,698,000. The CONPROCA proposal required an investment of $1.382 billion, while the Mitsubishi Consortium would result in a $2.615 billion investment.

16.     The Cadereyta Project was due to be completed by July 2, 2000.

### CONPROCA Contracts With PEMEX

17.     PEMEX awarded the Cadereyta Project to CONPROCA in 1997. On November

---

[2]     Available at http://www.skec.com/investment/ir_reference.asp (last visited on May 8, 2013.)

[3]     The Joint Venture originally included Grupo Tribasa, a bankrupt entity that is not relevant to this lawsuit. The main shareholder of Grupo Tribasa, David Peñaloza, was arrested in Spain for tax fraud in 2002.

26, 1997, PEMEX and CONPROCA entered into two contracts: the "Financed Public Works Contract" (COPF) and the "Unit Price Public Works Contract" (COPPU) (collectively, the "Contract").

18.     The COPF established the specifications, terms, and conditions for the Cadereyta Project.  The Defendants obtained financing for the COPF through the issuance of bonds registered with the SEC, and through institutional credit, a substantial amount of which were issued by U.S. financial institutions and guaranteed by the Export-Import Bank of the United States.  As the COPF was a PIDIREGAS[4] agreement, PEMEX issued twenty promissory notes to CONPROCA, which PEMEX paid once the Cadereyta Project was delivered to PEMEX.

19.     The COPPU stated that CONPROCA would receive payment for work orders required by unexpected events resulting in additional work to timely complete the Cadereyta Project up to $80,000,000.00.  Under the COPPU, all those additional work orders would be paid through the PEMEX Project Funding Master Trust (the "Master Trust"), located in New York.

***CONPROCA Contracts with PREF***

20.     CONPROCA also signed a contract with PREF.  On July 7, 2000, the parties signed the *Primer Convenio de Reconocimiento de Adeudo o Primer Convenio de Pago Provisional* (the "Provisional Payments Agreement of July 7, 2000").  In this agreement, PREF acknowledged the existence "of a present or future indebtedness" to CONPROCA arising from

---

[4]     PIDIREGAS stands for "Proyectos de Inversión Diferida En El Registro del Gasto," which translates to "Investment Projects with Deferred Expenditure Registration," and refers to Mexico's system for financing long-term infrastructure projects.  Under Mexico's General Law of Public Debt, a PIDIREGAS project must be a long-term productive infrastructure project which is: (i) related to an economic activity identified as a priority by the Mexican Government; (ii) expected to generate funds sufficient to repay the financing incurred for the project, and (iii) previously approved by the Mexican Government.

additional work orders submitted or to be submitted under the COPPU.  CONPROCA thus obtained an agreement for preapproval of expenses or invoices in violation of Mexican law.  The Provisional Payments Agreement of July 7, 2000 also stated that PREF would pay for additional work in advance but reserved the right to seek a credit from CONPROCA for any overpayments. Pursuant to this agreement, CONPROCA issued Invoice 252 for payment of a future indebtedness.  This Invoice was later substituted for Invoice 501 for $48,520,000.00.

21.     On August 23, 2000, CONPROCA requested that PREF (i) extend the deadline for completion of the Cadereyta Project and (ii) approve payments for additional work necessary to complete the Cadereyta Project (the "August 23, 2000 claims").  CONPROCA claimed that a series of man-made and natural events conspired to delay its completion of the Cadereyta Project on a timely basis.  More specifically, CONPROCA alleged that it needed more time (and money) because of problems accessing the construction site, toxic leaks, interference from PREF, delays in obtaining work permits, archeological discoveries, right-of-way controversies, power supply interruptions, unsafe operations, delays due to insufficient lighting, and rain delays. CONPROCA, however, did not provide evidentiary support for such claims.

22.     CONPROCA's August 23, 2000 claims for more money were reviewed by the Centro de Investigación Aplicada y Tecnología Avanzada del Instituto Politécnico Nacional ("CICATA-IPN"), a private entity related to Mexico's Department of Public Administration and unrelated to either PEMEX or Defendants.  Under the COPF, CICATA-IPN would act as a technical auditor of the Contract.  CICATA-IPN assessed whether CONPROCA's claims were sufficiently supported as required by the COPPU and whether PEMEX should ultimately pay any monies.  The CICATA-IPN report concluded that PREF should not pay CONPROCA any additional monies because these payments were not authorized under the original Contract and, even if authorized, were not

adequately documented or otherwise supported.

23.     PREF's Organo Interno de Control ("Internal Control Department at PREF") (the "OIC"), received the CICATA-IPN Report.  OIC is a division of Mexico's Public Administration Department and is in charge of ensuring the honest, efficient, and transparent management of public institutions in Mexico.   To that end, the OIC places representatives in different governmental entities.

24.     The OIC transmitted the Report to the members of the Comite Tecnico Especializado del Consejo de Administracion de PREF (the "Technical Committee"), which comprises officers of both Petroleos and PREF, for their use in reviewing CONPROCA's August 23, 2000 claims.  The Technical Committee was led by Juan Mauricio Toussaint Ribot and included PREF employees Jaime Mario Willars Andrade, Eduardo Vergara Cabrera, and Máximo Téllez Rosas.  Luis Enrique Bouchot, PREF'S general counsel, pursuant to PEMEX's internal procedures, supervised and approved the Technical Committee's decisions.

25.     Rejecting the CICATA-IPN's Report, the Technical Committee agreed to (i) extend the July 7, 2000 Agreement until February 28, 2001 in order to keep paying CONPROCA for present or future indebtedness arising from additional work orders made or to be made under the COPPU and (ii) allow PREF and CONPROCA to enter into additional agreements for the payment of the cost overruns listed in CONPROCA's August 23, 2000 claims.

26.     The first agreement for the payment of cost overruns was the *Convenio de Trabajos Complementarios* of November 15, 2000 (the "Complementary Works Agreement of November 15, 2000").   Through this agreement, PREF purportedly acknowledged a "present or future indebtedness" to CONPROCA arising from additional work orders made or to be made under the COPPU.   The additional work orders included work allegedly already performed

including the installation of electrical equipment, wiring, changing motors, and new transformers.

27.    Because of the number of claims presented by CONPROCA, the short period of time given to review those claims, and the number of documents to be reviewed in connection with the claims, PREF agreed to make a provisional payment for the maximum amount of $29,978,075.00 (plus value added tax) to CONPROCA.   Accordingly, CONPROCA issued Invoice 525 for $25,700,000.00 and Invoice 532 for $4,278,075.00.

28.    The members of the Technical Committee – Toussaint Ribot, Jaime Mario Willars Andrade, and Tellez Rosas – approved the Complementary Works Agreement.   The three committee members, however, never submitted the Agreement to PREF's Board of Directors for its approval in violation of PREF's internal procedures.   Luis Enrique Bouchot as the supervising counsel also failed to submit the Agreement to PREF's Board of Directors.

29.    In order to accommodate CONPROCA's request for an extension of time to complete the Cadereyta Project, CONPROCA and PREF signed the *Convenio de Ajuste de Eventos Críticos* on December 12, 2000 ("Critical Event Adjustment Agreement of December 12, 2000").   Under this agreement the parties agreed to extend the last three dates for completion of "critical events" listed in the Contract, including the final date for completion of the Cadereyta Project.

30.    CONPROCA also requested payment of direct expenses under the COPPU. To address CONPROCA's requests, CONPROCA and PREF entered into the *Convenio de Gastos Directos* on January 8, 2001 ("Direct Expenses Agreement of January 8, 2001").   Through this agreement, PREF acknowledged that CONPROCA should be provisionally reimbursed for direct expenses through the PEMEX Project Funding Master Trust for the maximum amount of

$68,375,606.  The Direct Expenses Agreement established that each work order would be approved by PREF.  Pursuant to this agreement, CONPROCA issued Invoice 533 for $68,375,605.00.

31.    CONPROCA also issued Invoice 582 for $1,486,466.73, Invoice 583 for $2,087,450.48, and Invoice 584 for $9,011,028.98 under the COPPU.  Although the invoices lacked evidentiary support, they were paid.

***The PEMEX Project Funding Master Trust***

32.    The Master Trust is a trust located in New York, but organized as a Delaware trust, and created on November 10, 1998.  The Bank of New York served as the Managing Trustee and maintained the Master Trust's account at its New York location. PEMEX was the sole beneficiary of the Trust and controlled all of its activities.

33.    The Trust's purpose was to facilitate the financing of the various PIDIREGAS projects, including investing monies earmarked for the projects and payments to vendors and service providers for the projects.

34.    PEMEX or a subsidiary guarantor negotiated and entered into turn-key and other contracts for the construction of PIDIREGAS projects.

35.    PEMEX would then assign to the Trust the payment obligations under the related project contracts through an Assignment and Indemnity Agreement dated November 10, 1998. Under the this Agreement, PEMEX issued several Assignment Certificates related to the Cadereyta Project through which the New York Master Trust became the obligor under the COPPU.

36.    Accordingly, upon receipt by PEMEX of invoices under the project contracts, PEMEX would transmit a Designated Obligation Payment Instruction ("DOPI"), attaching each

invoice, by fax, to the Master Trust instructing it to make payment to CONPROCA.

*The Scheme To Defraud Plaintiffs*

37.     In order to obtain the Cadereyta Project, Siemens and SKEC, working through CONPROCA, presented a significantly lower economic proposal than their only other remaining competitor.  Notably, CONPROCA's Financing Plan described that CONPROCA would issue five tranches of debt in the aggregate principal amount of $1,521,115,210, through several agreements with financial institutions and the issuance of bonds registered with the SEC.  The Financing Plan was transmitted via facsimile, i.e. using the wires, from New York to PEMEX in order to induce PEMEX to perform under the Contract, which was conditioned to CONPROCA obtaining financing for the Cadereyta Project.

38.     Having won the project, Defendants devised a plan to manufacture a series of cost overruns, the payment of which would allow them to make up the financial shortfall incurred by submitting an economically unrealistic bid.  As part of their scheme to defraud, upon information and belief, Defendants bribed several individuals at PEMEX, such as a former PEMEX official who was a Senator in Mexico.

39.     First, the corrupt payments allowed Defendants to secure additional agreements between PEMEX and CONPROCA, which created a supposedly "legal framework" for the payment of the cost overruns.  These additional agreements were obtained despite an external audit report submitted to PEMEX, which recommended that the cost overrun payments not be made because (i) they were not contemplated under the parties' original contract and (ii) they lacked documentary support.  In addition, these agreements were never submitted to the PEMEX board of directors in clear violation of the company's internal operating procedures.

40.     Second, having facilitated the creation of a so-called "legal framework," the

corrupt payments also facilitated the preparation, approval, and processing of several invoices relating to the manufactured cost overruns.

41.     PEMEX transmitted each fraudulent invoice via fax, *i.e.*, using the wires or mails, to the Master Trust in New York for payment through the DOPIs.

42.     Defendants knew that the fraudulent invoices would be paid from an account located in New York because CONPROCA's contract with PEMEX identified the Master Trust as the source of the payments related to the Cadereyta Project.   CONPROCA issued each invoice.  Each invoice issued by CONPROCA and transmitted to PEMEX and the Master Trust through a DOPI was signed and authorized by SKEC's General Manager.

43.     The specific fraudulent invoices transmitted through the wires were as follows:

| Invoice | Date of submission | Amount Invoiced | Total After Tax and Deductions |
|---|---|---|---|
| 501 | July 7, 2000 | $48,520,000.00 | $55,516,327.87 |
| 525 | December 14, 2000 | $25,700,000.00 | $29,412,930.40 |
| 532 | February 2, 2001 | $4,278,075.00 | $4,896,094.15 |
| 533 | February 2, 2001 | $68,375,605.00 | $78,184,874.49 |
| 582 | January 5, 2002 | $1,486,466.73 | $1,700,004.33 |
| 583 | January 5, 2002 | $2,087,450.48 | $2,389,663.46 |
| 584 | January 5, 2002 | $9,011,028.98 | $10,307,269.48 |

**Total Invoiced $ 159,458,626.19**

Each invoice constitutes a separate predicate act in violation of either the federal mail or wire statutes.

44.     Upon receipt of each fraudulent invoice through the DOPI, the Trustee for the Master Trust would authorize payment.  Each payment would be routed from the Master Trust account located at Bank of New York in New York to CONPROCA's account at Citibank, which PEMEX and CONPROCA contractually agreed would be located in New York.

45.     The payments were made as follows:

13

| Payment Date | Invoice # | Banking Institution | | Amount US Dollars |
| | | Origin | Destination | |
|---|---|---|---|---|
| August 4, 2000 | 501 | The Bank of New York | Citibank N.A. N.Y. | $48,238,327.87 |
| | | Bancomer, S.A. | Banamex | $7,278,000.00 |
| | | **Sub Total** | | $55,516,327.87 |
| December 14, 2000 | 525 | The Bank of New York | Citibank N.A. N.Y. | $25,557,930.40 |
| | | Bancomer, S.A. | Banamex | $3,855,000.00 |
| | | **Sub Total** | | $29,412,930.40 |
| February 6, 2001 | 532 | The Bank of New York | Citibank N.A. N.Y. | $4,254,382.90 |
| | | Bancomer, S.A. | Banamex | $641,711.25 |
| | | **Sub Total** | | $4,896,094.15 |
| February 6, 2001 | 533 | The Bank of New York | Citibank N.A. N.Y. | $67,928,533.74 |
| | | Bancomer, S.A. | Banamex | $10,256,340.75 |
| | | **Sub Total** | | $78,184,874.49 |
| January 16, 2002 | 582 | The Bank of New York | Citibank N.A. N.Y. | $1,477,034.32 |
| | | Bancomer, S.A. | Banamex | $222,970.01 |
| | | **Sub Total** | | $1,700,004.33 |
| January 16, 2002 | 583 | The Bank of New York | Citibank N.A. N.Y. | $2,076,545.89 |
| | | Bancomer, S.A. | Banamex | $313,117.57 |
| | | **Sub Total** | | $2,389,663.46 |
| January 16, 2002 | 584 | The Bank of New York | Citibank N.A. N.Y. | $8,955,615.13 |
| | | Bancomer, S.A. | Banamex | $1,351,654.35 |
| | | **Sub Total** | | $10,307,269.48 |

| **Total** | **$ 182,473,482.62** |
|---|---|

***The SEC Complaint Against Siemens***

46.     On December 12, 2008, the U.S. Securities & Exchange Commission filed a complaint against Siemens in *U.S. SEC vs. Siemens AG*, Case No. 1:08-cv-02167, which

establishes that "[i]n late 2004, Siemens PG and Siemens S.A. de C.V., a regional entity, made three separate illicit payments totaling approximately $2.6 million to a politically-connected business consultant to assist in settling cost overrun claims in connection with three refinery modernization projects in Mexico." *See* Cmpl. at ¶62.

47.     The SEC Complaint revealed facts evidencing that Siemens engaged in a systematic practice of paying bribes to PEMEX to obtain business.  Siemens conducted these illegal activities in Mexico and around the world.  Furthermore, Siemens concealed the nature of its corrupt payments through an elaborate payment scheme.  As part of its scheme to defraud, Siemens employed "business consultants" like Camil Garza.  These consultants would charge exorbitant fees which, once received by the consultants, would be paid out as bribes to maintain the scheme.

***Siemens Mexico's Former General Counsel Testifies***

48.     In early 2013, Luis Ruben Esparza met with PEMEX officials at PEMEX's offices in Mexico City.  During that meeting, Esparza offered to organize a meeting between Siemens Mexico's Former General Counsel, Peter Paul Muller, and PEMEX officials.  Although Esparza is a lawyer in Mexico, he was only acting as a go-between in order to facilitate the meeting.  Esparza advised that Muller had specific knowledge of the bribery allegations related to Siemens, SKEC, and the Cadereyta Project.

49.     On January 17, 2013, Muller voluntarily testified before a Notary Public in Mexico.  Muller's declaration referred to specific facts material to this action.  Specifically, Muller stated that he had seen the invoices that Jaime Camil Garza had issued to obtain $2.6 million dollars, which were approved by Siemens' Financial Director, Jose Querubin.  Muller added that Querubin told him that the monies paid to Jaime Camil Garza ended up in the hands

of a high ranked official in PEMEX.  Specifically, the goal of the bribe was to obtain payment of the substantial cost overruns that CONPROCA wanted to obtain on the Cadereyta Project.

50.     Muller, however, had more to tell.  Knowing this, Esparza later demanded that PEMEX pay him $1,300,000.00 in exchange for further testimony.  On April 16, 2013, Esparza was arrested on charges of extortion.

51.     Following Esparza's arrest, the Public Prosecution Office issued a subpoena for Muller to testify regarding his knowledge of the facts related to this RICO action on April 30, 2013.  Muller failed to comply with the first subpoena, and a second subpoena was issued for May 6, 2013.

52.     On May 6, 2013, Muller went to the Procuraduría General de la República (Solicitor General's Office) where he testified for approximately eight hours.   During his testimony, Muller confirmed that Siemens paid bribes to PEMEX officials connected to the Cadereyta Project cost overruns.  He further explained that the contract between Jaime Camil Garza and Siemens was a cover up designed to avoid suspicions over the exorbitant fees paid to him as a Siemens consultant.  According to Muller, the $2.6 million dollars Siemens paid to Camil Garza were paid to PEMEX officials.  Muller revealed that one of those PEMEX Officials was a Senator in Mexico.

53.     Muller added that there are other witnesses with knowledge of the facts related to this RICO complaint, including Viktor Warketin, who was one of the leaders of the Cadereyta Project, and Fuentes Pro, a witness located in Monterrey, Mexico.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Violations of Racketeering Influenced and Corrupt Organizations ("RICO")**
**Title 18 U.S.C. §§1962(c), 1964**

54.     Plaintiffs repeat and reallege paragraphs 1 through 53 of this Amended Complaint as if fully set forth herein.

55.     At all relevant times, Siemens and SKEC have each been a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

*The RICO Enterprise*

56.     The RICO Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing enterprise, as defined in the foregoing paragraphs of this Amended Complaint.  As a result of the scheme to defraud, Plaintiffs through the Master Trust paid millions of dollars to the RICO Defendants and their co-conspirators through which they would make up the financial shortfall incurred by submitting an economically unrealistic bid.  CONPROCA submitted this Financing Plan from New York via facsimile, i.e. using the wires, to PEMEX on June 30, 1998.

57.     The RICO Defendants and their co-conspirators organized their operation into a group with specific and assigned responsibilities and structure to receive the benefits of their scheme to defraud in the U.S.:

a.     Defendant Siemens caused the invoices to be transmitted to PEMEX for payment through the Master Trust.

b.     Defendant SKEC approved the invoices that were submitted to PEMEX, thus furthering the RICO Defendants' enterprise.  SKEC's General Manager signed and approved the invoices submitted by CONPROCA to PEMEX to obtain the

overpayments.

c.     Jaime Federico Said Camil Garza, upon information and belief, managed the enterprise by funneling the bribes to officials at PEMEX to further the RICO Defendants' enterprise.

d.     Eduardo Vergara Cabrera was in charge of approving payment of several fraudulent invoices.  Vergara Cabrera was ultimately removed and banned from public employment for 20 years for irregularities in approving payment of cost overrun invoices.[5]

e.     Maximo Tellez Rosas was also in charge of approving payment of the fraudulent invoices. Tellez Rosas was ultimately removed and banned from public employment for 20 years for irregularities in approving payment of cost overrun invoices.[6]

f.     Luis Enrique Bouchot, Counsel at PREF, allowed the payment of the invoices by signing of the agreements that caused Plaintiffs to be defrauded.  Bouchot was ultimately removed and banned from public employment for 2 years for irregularities in approving payment of cost overrun invoices.[7]

g.     Cesar Nava Vazquez prevented PEMEX from cashing several letters of credit for $102.8 million, therefore serving as a conduit for furthering the RICO Defendants' criminal enterprise.

---

[5]    Vergara Cabrera appealed this order, which was ultimately reversed.  The Ministry of Public Administration appealed the reversal and the appeal is still pending.

[6]    Tellez Rosas also appealed this order, which was ultimately reversed.  The Ministry of Public Administration appealed the reversal and the appeal is still pending.

[7]    Luis Enrique Bouchot appealed this order, which was ultimately reversed.  Mexico's Ministry of Public Administration appealed the reversal and the appeal is still pending.

h.      Upon information and belief there were other individuals at PEMEX who received illicit payments in order to approve, authorize, and transmit the fraudulent invoices to the Master Trust to procure their payment.

58.     CONPROCA constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and 1962(c).  Each of the RICO Defendants participated in the operation or management of the CONPROCA Enterprise.

59.     At all relevant times, the CONPROCA Enterprise was engaged in and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962.

*The Pattern Of Racketeering Activity*

60.     The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the CONPROCA Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), including:

a.      The RICO Defendants engineered a scheme to defraud Plaintiffs through the Master Trust and obtain millions of dollars in payments that would directly benefit the RICO Defendants.

b.      In furtherance of their scheme, the RICO Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, including, payment orders transmitted through the wires to Bank of New York for payment of the different invoices submitted by CONPROCA.

c.      The RICO Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Plaintiffs through the

Master Trust into paying the RICO Defendants and their co-conspirators.  The RICO Defendants knowingly and willfully submitted false invoices, which the RICO Defendants knew to be false or misleading, to obtain payment.

d.      The pattern of racketeering activity, which began before 2000, continued through 2002 involving racketeering acts or predicate acts.

61.      These acts of racketeering or predicate acts were related to the CONPROCA Enterprise and had similar purposes, participants, results, victims and methods of commission. These acts of racketeering activity include, but are not limited to, the following:

a.      Predicate Act #1: Wire Fraud for Financing Plan In Violation of 18 U.S.C. § 1343:

As described above, Siemens and SKEC, having devised, or intended to devise, a scheme or artifice to defraud for obtaining money or property by means of false or fraudulent pretenses, knowingly and willfully caused a Financing Plan to be transmitted by CONPROCA through the wires, specifically, through fax from New York, to PEMEX, for the purpose of making up the financial shortfall incurred by submitting an economically unrealistic bid, in furtherance of executing their scheme in violation of Title 18 U.S.C. § 1343.  Specifically, Siemens and SKEC committed wire fraud in violation of 18 U.S.C. § 1343 by transmitting the Financial Plan to PEMEX from New York to induce PEMEX to perform under the Contract, which was conditioned to CONPROCA obtaining financing for the Cadereyta Project.

b.      Predicate Act #2: Deprivation of Right to Honest Services In Violation of 18 U.S.C. §§ 1343, 1346:

As described above, Siemens and SKEC, having devised a scheme or artifice to defraud Plaintiffs, paid bribes to PEMEX officials for the purpose of knowingly and intentionally

depriving PEMEX of the intangible right of those officials' honest services. Specifically, the Defendants' bribes caused the relevant PEMEX officials to make misrepresentations as to the appropriateness of Siemens' and SKEC's fraudulent invoices, which influenced PEMEX to approve the invoices in contravention of PEMEX's regulations, in the face of audit reports advising to the contrary, and with knowledge that the invoices were fraudulent. Both the bribe payments and the fraudulent invoices were transmitted by Defendants and their co-conspirators, or caused to be transmitted by CONPROCA, through the wires. The purpose of this fraud, like all of Defendants' other fraud, was to fraudulently obtain payments from the Master Trust.

        c.      <u>Predicate Act #3: Wire Fraud for Invoice 501 In Violation of 18 U.S.C. § 1343</u>:

As described above, Siemens and SKEC, having devised, or intended to devise, a scheme or artifice to defraud for obtaining money or property by means of false or fraudulent pretenses, knowingly and willfully caused invoices to be transmitted by CONPROCA through the wires to the Master Trust through PEMEX, for the purpose of executing their scheme in violation of Title 18 U.S.C. § 1343. Specifically, Siemens and SKEC committed wire fraud in violation of 18 U.S.C. § 1343 by submitting invoice number 501 and obtaining $48,238,327.87.

        d.      <u>Predicate Act #4: Wire Fraud for Invoice 525 In Violation of 18 U.S.C. § 1343</u>:

As described above, Siemens and SKEC, having devised, or intended to devise, a scheme or artifice to defraud for obtaining money or property by means of false or fraudulent pretenses, knowingly and willfully caused invoices to be transmitted by CONPROCA through the wires to the Master Trust through PEMEX, for the purpose of executing their scheme in violation of Title 18 U.S.C. § 1343. Specifically, Siemens and SKEC committed wire fraud in violation of 18 U.S.C. § 1343 by submitting invoice number 525 and obtaining $25,557.930.40.

        e.      <u>Predicate Act #5: Wire Fraud for Invoice 532 In Violation of 18 U.S.C. § 1343</u>:

As described above, Siemens and SKEC, having devised, or intended to devise, a scheme or artifice to defraud for obtaining money or property by means of false or fraudulent pretenses, knowingly and willfully caused invoices to be transmitted by CONPROCA through the wires to the Master Trust through PEMEX, for the purpose of executing their scheme in violation of Title 18 U.S.C. § 1343.  Specifically, Siemens and SKEC committed wire fraud in violation of 18 U.S.C. § 1343 by submitting invoice number 532 and obtaining $4,254,382.90.

      f.      <u>Predicate Act #6: Wire Fraud for Invoice 533 In Violation of 18 U.S.C. § 1343</u>:

As described above, Siemens and SKEC, having devised, or intended to devise, a scheme or artifice to defraud for obtaining money or property by means of false or fraudulent pretenses, knowingly and willfully caused invoices to be transmitted by CONPROCA through the wires to the Master Trust through PEMEX, for the purpose of executing their scheme in violation of Title 18 U.S.C. § 1343.  Specifically, Siemens and SKEC committed wire fraud in violation of 18 U.S.C. § 1343 by submitting invoice number 533 and obtaining $67,928,533.74.

      g.     <u>Predicate Act #7: Wire Fraud for Invoice 582 In Violation of 18 U.S.C. § 1343</u>:

As described above, Siemens and SKEC, having devised, or intended to devise, a scheme or artifice to defraud for obtaining money or property by means of false or fraudulent pretenses, knowingly and willfully caused invoices to be transmitted by CONPROCA through the wires to the Master Trust through PEMEX, for the purpose of executing their scheme in violation of Title 18 U.S.C. § 1343.  Specifically, Siemens and SKEC committed wire fraud in violation of Title 18 U.S.C. § 1343 by submitting invoice number 582 and obtaining $1,477,034.32.

      h.     <u>Predicate Act #8: Wire Fraud for Invoice 583 In Violation of 18 U.S.C. § 1343</u>:

As described above, Siemens and SKEC, having devised, or intended to devise, a scheme or artifice to defraud for obtaining money or property by means of false or fraudulent pretenses,

knowingly and willfully caused invoices to be transmitted by CONPROCA through the wires to the Master Trust through PEMEX, for the purpose of executing their scheme in violation of Title 18 U.S.C. § 1343.  Specifically, Siemens and SKEC committed wire fraud in violation of 18 U.S.C. § 1343 by submitting invoice number 583 and obtaining $2,076,545.89.

i.      Predicate Act #9: Wire Fraud for Invoice 584 In Violation of 18 U.S.C. § 1343:

As described above, Siemens and SKEC, having devised, or intended to devise, a scheme or artifice to defraud for obtaining money or property by means of false or fraudulent pretenses, knowingly and willfully caused invoices to be transmitted by CONPROCA through the wires to the Master Trust through PEMEX, for the purpose of executing their scheme in violation of Title 18 U.S.C. § 1343.  Specifically, Siemens and SKEC committed wire fraud in violation of 18 U.S.C. § 1343 by submitting invoice number 584 and obtaining $8,955,615.13.

62.     These predicate acts all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

63.     The CONPROCA Enterprise was at all times distinct from the pattern of racketeering activity alleged herein in that the CONPROCA Enterprise engaged in legitimate business activities beyond those necessary to carry out the alleged acts of racketeering.

64.     This pattern of racketeering activity has injured plaintiffs in their business and property in violation of 18 U.S.C. §1964(c).

**SECOND CLAIM FOR RELIEF**
**Conspiracy to Violate  RICO, Violation of 18 U.S.C. §§ 1962(d)**

65.     Plaintiffs repeat and reallege paragraphs 1 through 53 of this Amended Complaint as if fully set forth herein.

66.     From at least as early as 1997 through 2002, the RICO Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together

23

and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

67.     The RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts as part of the racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

68.     Each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain property from Plaintiffs through the Master Trust.  It was part of the conspiracy that the RICO Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth above.

69.     As a direct and proximate result of the RICO Defendants' conspiracy, the CONPROCA Enterprise's racketeering activity, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured.

### THIRD CLAIM FOR RELIEF
#### Fraud

70.     Plaintiffs repeat and reallege paragraphs 1 through 53 of this Amended Complaint as if fully set forth herein.

71.     Defendants, through several fraudulent invoices issued through the Enterprise CONPROCA, repeatedly represented to Plaintiffs that they were entitled to the payment of certain monies.

72.     Defendants knew that the invoices were false when they were submitted to PEMEX for payment.  Indeed, each invoice issued by CONPROCA and transmitted to PEMEX

and the Master Trust was signed and authorized by SKEC's General Manager with Siemens knowledge. Defendants' intention was to induce PEMEX to rely upon the fraudulent invoices and cause PEMEX to pay them through the Master Trust.

73.     In justifiable reliance on Defendants' false invoices, Plaintiffs, through the Trustee for the Master Trust, authorized payment from the Master Trust account located at Bank of New York in New York to CONPROCA's account at Citibank, to Plaintiffs' detriment.

74.     As a result of Defendants' conduct, Plaintiffs have been damaged in millions of dollars.

## PRAYER FOR RELIEF

75.     Wherefore Plaintiffs respectfully pray for the following relief:

a.     Damages in an amount to be determined at trial, to be trebled pursuant to the RICO statute, 18 U.S.C. §1964(c);

b.     Attorney's fees and costs pursuant to 18 U.S.C. § 1964(c); and

c.     Any other relief that the Court deems just and proper.

## TRIAL BY JURY DEMAND

Plaintiffs demand trial by jury for all matters so triable.

Date: May 8, 2013.

Respectfully submitted:

DIAZ REUS & TARG, LLP
100 Southeast 2nd Street, Suite 2600
Miami, FL 33131
Telephone: (305) 375-9220
Facsimile: (305) 375-8050

/s/Michael Diaz, Jr.
Michael Diaz, Jr. (Pro Hac Vice pending)
Attorney E-mail Address: mdiaz@diazreus.com
Carlos F. Gonzalez (Pro Hac Vice pending)

25

Attorney E-mail Address:  cgonzalez@diazreus.com
Marta Colomar Garcia (Pro Hac Vice pending)
Attorney E-mail Address: mcolomar@diazreus.com

– and –

DIAZ, REUS & TARG, LLP
445 East 80th Street, Suite 12D
New York, NY 10075
Telephone: (917)-903-4560
Facsimile: (888)-984-4111

_____
Eliyahu Z. Kaploun (N.Y. Bar Number: 4466868)
Attorney E-mail Address: ekaploun@diazreus.com

– and –

GOLDSTEIN & RUSSELL, P.C.
5225 Wisconsin Ave. NW
Suite 404
Washington, DC 20015
Telephone: (202) 362-0636
Facsimile: (866) 574-2033

/s/ Thomas C. Goldstein
_____
Thomas C. Goldstein (Admitted Pro Hac Vice)
Attorney E-mail Address:  tgoldstein@goldsteinrussell.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via email

on May 8, 2013, to the parties listed below:

Laura A. Brevetti
Brian D. Koosed
K&L GATES LLP
599 Lexington Avenue
New York, NY 10022
Tel; 212-536-3900

Fax; 212-536-3901
laura.brevetti@klgates.com
brian.koosed@klgates.com

*Counsel for SK Engineering & Construction Co., Ltd.*

Thomas D. Yanucci, P.C.
Brant W. Bishop, P.C.
Chris Posteraro
Ragan Naresh
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Suite 1200
Washington, DC 20005
thomas.yannucci@kirkland.com
brant.bishop@kirkland.com
chris.posteraro@kirkland.com
ragan.naresh@kirkland.com

*Counsel for Siemens AG*