UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PETRÓLEOS MEXICANOS AND
PEMEX REFINACIÓN,

                     Plaintiffs

           - against -

SK ENGINEERING & CONSTRUCTION CO., LTD.
AND SIEMENS AKTIENGESELLSCHAFT

                  Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**12 Civ. 9070 (LLS)**

**ECF CASE**

**Oral Argument Requested**


**SK ENGINEERING & CONSTRUCTION CO., LTD.'s
MEMORANDUM OF LAW
<u>IN SUPPORT OF MOTION TO DISMISS</u>**


WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
Phone: (212) 819-8200
Facsimile: (212) 354-8113

K&L GATES LLP
599 Lexington Avenue
New York, New York 10022
Phone: (212) 536-3900
Facsimile: (212) 536-3901

Attorneys for Defendant
SK ENGINEERING &
CONSTRUCTION CO., LTD.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................4

ARGUMENT ...........................................................................................................10

I.      PEMEX'S RICO CLAIMS FAIL AS A MATTER OF LAW BECAUSE THE
        ALLEGED U.S. CONNECTIONS ARE INSUFFICIENT AND IRRELEVANT ..........10

II.     PEMEX'S CLAIMS ARE BARRED BY RES JUDICATA.................................15

III.    PEMEX FAILS TO PLEAD THE ELEMENTS OF ITS CAUSES OF ACTION ..........21

        A.      PEMEX FAILS TO PLEAD A RICO CLAIM ...................................23

                1.      PEMEX Fails To Plead A Viable Predicate Act........................23

                        i.      PEMEX Fails To Plead Underbidding............................25

                        ii.     PEMEX Fails To Plead How The Invoices Were Fraudulent .......25

                        iii.    PEMEX Fails To Plead Bribery.................................26

                        iv.     PEMEX Fails To Plead How SKEC Had Knowledge Of Or
                                Participated In The Alleged Scheme...............................30

                        v.      PEMEX May Not Plead A Scheme To Deprive It Of The
                                Intangible Right To Honest Services ............................31

                2.      PEMEX Fails To Plead Causation.................................34

                3.      PEMEX Fails To Plead A "Pattern" Of Racketeering Activity................36

                        i.      The Alleged Scheme Was Inherently Terminable .......................37

                        ii.     PEMEX Cannot Plead A Close-Ended Scheme ...........................38

                4.      PEMEX Fails To Plead A RICO Conspiracy ............................41

        B.      PEMEX FAILS TO PLEAD FRAUD ..............................................43

                1.      PEMEX Fails To Plead With Any Particularity ......................43

                2.      PEMEX Fails To State The Elements Of A Fraud Claim ........................44

IV.     PEMEX'S RICO CLAIMS ARE TIME-BARRED .....................................46

        A.      THE RICO CLAIMS ARE TIME-BARRED..........................................46

        B.      THE FRAUD CLAIM ALSO IS TIME-BARRED.................................48

CONCLUSION........................................................................................................49

NEWYORK 8856530

## TABLE OF AUTHORITIES

### CASES

Adler v. Berg Harmon Assocs., 790 F. Supp. 1222 (S.D.N.Y. 2004) .........................................42, 43

Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143 (1987) ...............................36

Am. Home Mortgage Corp. v. UM Sec. Corp., No. 05 CIV 2279 (RCC),
    2007 WL 1074837 (S.D.N.Y. Apr. 9, 2007)..............................................................................46

Anatian v. Coutts Bank (Switz.) Ltd., 193 F.3d 85 (2d Cir. 1999)...................................................26

Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006) .................................................................34

Ashcroft v. Iqbal, 556 U.S. 662 (2009)...........................................................................................21

Battle v. Assocs. for Women's Med. PLLC, No. 05 Civ. 8373 (DC),
    2006 WL 2642137 (S.D.N.Y. Sept. 15, 2006)............................................................. 4-5, 16, 45

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ..............................................................21, 22, 24

Blue Tree Hotels Inv. (Can.) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,
    369 F.3d 212 (2d Cir. 2004)........................................................................................................4

Boritzer v. Calloway, No. 10-Civ-6264 (JPO), 2013 WL 311013 (S.D.N.Y. Jan. 24, 2013) ..........27

Bui v. Indus. Enters. of Am., Inc., 594 F. Supp. 2d 364 (S.D.N.Y. 2009) ......................................45

Calabrese v. CSC Holdings, Inc., 2003 WL 22052824 (E.D.N.Y. Aug. 13, 2003)........................24

Carvel v. Ross, No. 09 CIV. 0722, 2011 WL 856283 (S.D.N.Y. Feb. 16, 2011)............................44

Casio Computer Co., Ltd. v. Sayo, No. 98CV3772 (WK), 2000 WL 1877516
    (S.D.N.Y. Oct. 13, 2000) .....................................................................................................39, 42

Cedeño v. Intech Grp., Inc., 733 F. Supp. 2d 471 (S.D.N.Y. 2010)..........................................11, 13

Cofacrédit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229 (2d Cir. 1999) ....................41, 42

Com-Tech Assocs. v. Computer Assocs. Int'l, 753 F. Supp. 1078 (E.D.N.Y. 1990)................42, 43

Cont'l Realty Corp. v. J.C. Penney Co., Inc., 729 F. Supp. 1452 (S.D.N.Y. 1990) ........................39

Discon, Inc. v. NYNEX Corp., 93 F.3d 1055 (2d Cir. 1996) ...........................................................43

NEWYORK 8856530

DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242 (2d Cir. 1987) ...................22, 26, 27

Fahlenbach v. Trans Pac. Capital (USA) Inc., No. 95-civ-8776, 1996 WL 22602
    (S.D.N.Y. Jan. 19, 1996)............................................................................................42

FD Prop. Holding, Inc. v. US Traffic Corp., 206 F. Supp. 2d 362 (E.D.N.Y. 2002) ...............39, 42

Feitshans v. Kahn
    No. 06 Civ. 2125 (SAS), 2006 WL 2714706 (S.D.N.Y. Sept. 21, 2006) .......................4, 15, 16

First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159 (2d Cir. 2004)........................... passim

First Interregional Advisors Corp. v. Wolff, 956 F. Supp. 480 (S.D.N.Y. 1997).....................24, 25

First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994)....................................34

Fuji Photo Film U.S.A., Inc. v. McNulty, 640 F. Supp. 2d 300 (S.D.N.Y. 2009).....................29, 30

GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463 (2d Cir. 1995)..........................37, 38, 39

H.J. Inc. v. N.W. Bell Tel. Co., 492 U.S. 229 (1989) .......................................................................36

Hemi Grp., LLC v. City of New York, 130 S. Ct. 983 (2010) .........................................................34

In re Am. Int'l Grp., Inc. Consol. Derivative Litig., 976 A.2d 872 (Del. Ch. 2009) .......................36

In re DJK Residential LLC, 416 B.R. 100 (Bankr. S.D.N.Y. 2009)..................................................26

In re Integrated Res. Real Estate Ltd. P'Ship Secs. Litig., 850 F. Supp. 1105
    (S.D.N.Y. 1993)............................................................................................................41

In re Parmalat Sec. Litig., 412 F. Supp. 2d 392 (S.D.N.Y. 2006) .............................................35, 36

In re Sumitomo Copper Litig., 995 F. Supp. 451 (S.D.N.Y. 1998)..................................................22

In re Vivendi Universal, S.A. Sec. Litig., 765 F. Supp. 2d 512 (S.D.N.Y. 2011) .....................14, 15

Int'l Audiotext Network, Inc. v. AT&T Co., 62 F.3d 69 (2d Cir. 1995)............................................7

Koch v. Christie's Int'l PLC, 699 F.3d 141 (2d Cir. 2012) .......................................................46, 48

Kramer v. Time Warner Inc., 937 F.2d 767 (2d Cir. 1991).............................................................6

Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229
    (2d Cir. 1999)...............................................................................................................34

Lerner v. Fleet Bank, N.A., 318 F.3d 113 (2d Cir. 2003)...............................................................23

NEWYORK 8856530

Lundy v. Catholic Health Sys. of Long Island, Inc., 711 F.3d 106 (2d Cir. 2013) .............21, 22, 23

McLaughlin v. Anderson, 962 F.2d 187 (2d Cir. 1992) ...................................................................23

McNally v. United States, 483 U.S. 350 (1987) ..............................................................................31

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young, No. 91-civ-2923 (CSH),
    1994 WL 88129 (S.D.N.Y. Mar. 15, 1994) .......................................................................39, 41

Monsieur Touton Selection, Ltd. v. Future Brands, LLC, No. 06-civ-1124 (SAS),
    2006 WL 2192790 (S.D.N.Y. Aug. 1, 2006).................................................................................4

Morrison v. Nat'l Austl. Bank, Ltd., 130 S. Ct. 2869 (2010) .........................................10, 11, 12, 15

Norex Petroleum Ltd. v. Access Indus., Inc., 540 F. Supp. 2d 438 (S.D.N.Y. 2007) .....................13

Norex Petroleum Ltd. v. Access Indus., Inc., 631 F.3d 29 (2d Cir. 2010) ......................3, 10, 11, 12

Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,
    85 F. Supp. 2d 282 (S.D.N.Y. 2000)...........................................................................22, 42, 43, 44

Pike v. Freeman, 266 F.3d 78 (2d Cir. 2001) ...........................................................................15, 16

Procapui-Productores de Camaroes De Icapui Ltda. v. Layani, No. 07-CV-6627 (BSJ),
    2008 WL 3338199 (S.D.N.Y. Jan. 11, 2008)...........................................................................26, 43

Purchase Real Estate Grp. Inc. v. Jones, No. 05-civ-10859, 2010 WL 3377504
    (S.D.N.Y. Aug. 24, 2010) ..........................................................................................23, 27, 37

Republic of Iraq v. ABB AG
    No. 08-cv-5951 (SHS), 2013 WL 441959 (S.D.N.Y. Feb. 6, 2013) ..............................11, 12, 14

Roberto's Fruit Market, Inc. v. Schaffer, 13 F. Supp. 2d 390 (E.D.N.Y. 1998).......................29, 30

Rogers v. McDorman, 521 F.3d 381 (5th Cir. 2008)......................................................................36

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004)...............................................................21, 26, 44

Rotella v. Wood, 528 U.S. 549 (2000) ...........................................................................................47

S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629 (2d Cir. 1996).......................23, 44

Schlaifer Nance & Co. v. Estate of Andy Warhol, 119 F.3d 91 (2d Cir. 1997) ..............................40

Skilling v. United States, 130 S. Ct. 2896 (2010).........................................................................32

Spool v. World Child Int'l Adoption Agency, 520 F.3d 178 (2d Cir. 2008).............................37, 38

NEWYORK 8856530

Terra Sec. Asa Konkursbo v. Citigroup, Inc., 740 F. Supp. 2d 441 (S.D.N.Y. 2010)......................45

United States v. Chao Fan Xu, No. 09-10189, 2013 WL 28392 (9th Cir. Jan. 3, 2013) .................11

United States v. Giffen, 326 F. Supp. 2d 497 (S.D.N.Y. 2004)..................................................33, 34

United States v. Philip Morris USA, Inc., 783 F. Supp. 2d 23 (D.D.C. 2011) ................................11

United States v. Rybicki, 354 F.3d 124 (2d Cir. 2003) ...........................................................31, 32

World Wrestling Entm't, Inc. v. Jakks Pac., Inc., 328 F. App'x 695 (2d Cir. 2009).................46, 47

World Wrestling Entm't, Inc. v. Jakks Pac., Inc., 530 F. Supp.2d 486
    (S.D.N.Y. 2007).................................................................................................................47

## STATUTES AND RULES

18 U.S.C. § 1341 ..............................................................................................................23

18 U.S.C. § 1343 ..............................................................................................................23

18 U.S.C. § 1346 ...........................................................................................23, 32, 33, 34

18 U.S.C. § 1961 ..............................................................................................................36

18 U.S.C. § 1962 .....................................................................................................23, 41, 42

18 U.S.C. § 1964 .....................................................................................................23, 34

28 U.S.C. § 1367 ..............................................................................................................46

Fed. R. Civ. P. 5 ...............................................................................................................10

Fed. R. Civ. P. 8 ........................................................................................................ passim

Fed. R. Civ. P. 9 ........................................................................................................ passim

## MISCELLANEOUS

Arthur R. Miller & Mary Kay Kane, 5A FED. PRAC. & PROC. § 1297 (3d ed. 2004)......................26

NEWYORK 8856530

Defendant SK Engineering & Construction Co., Ltd. ("SKEC") submits this memorandum of law in support of its motion to dismiss the amended complaint filed by Plaintiffs Petróleos Mexicanos and Pemex-Refinación ("PR") (together, "PEMEX" or "Plaintiffs") on May 8, 2013 (the "Amended Complaint" or "Am. Compl.").

## PRELIMINARY STATEMENT

This RICO action arises from contracts signed in the 1990s between Plaintiffs, both instrumentalities of the Mexican government, and CONPROCA, S.A. de C.V. ("CONPROCA"), a non-U.S. consortium owned by SKEC and Siemens Aktiengesellschaft ("Siemens") (together with SKEC, "Defendants"), under which CONPROCA modernized and expanded a large oil refinery in Cadereyta, Mexico (the "Project"). After disputes arose regarding cost-overruns and extra work on the Project, there was a ten-year international arbitration between CONPROCA and PEMEX (the "Arbitration"). That Arbitration resulted in an award of over $500 million to CONPROCA, including interest and taxes (the "Final Award").

In December 2011, CONPROCA commenced proceedings to confirm the Final Award in this Court. The confirmation proceedings were fully briefed as of October 2012. In a transparent attempt to somehow obstruct confirmation, in December 2012 PEMEX filed a seven-page RICO complaint (the "Complaint"). The Complaint was based on unidentified and unspecified acts of bribery that allegedly involved PEMEX's own employees and occurred in Mexico more than a decade ago. PEMEX took no steps to serve that Complaint and even moved to stay it.

Defendants moved to dismiss the Complaint in March 2013.[1] Rather than respond, Plaintiffs chose to amend – *twice* – the deficient Complaint, resulting in the current "Amended"

---

[1]   On December 24, 2012, PEMEX filed a motion to stay the Complaint. See Plaintiffs' Motion to Stay, dated December 24, 2012 (the "Motion to Stay"). Although the Complaint did not establish personal jurisdiction

Complaint, which is actually Plaintiffs' third.  The Amended Complaint now alleges a purported scheme by Defendants to underbid the Project and recoup the resulting economic shortfall by bribing PEMEX officials to approve and pay invoices for allegedly fraudulent cost overruns.

The Amended Complaint is deficient on its face and should be dismissed now.  As a threshold matter, the case as alleged involves almost exclusively extraterritorial conduct and is not cognizable under the RICO statute.  In addition, PEMEX wholly fails to plead any facts showing that SKEC either had knowledge of or intent to participate in the alleged scheme. PEMEX also fails to allege that SKEC participated in or made any alleged improper payments or bribes.  Nor does PEMEX provide any factual support for its allegation that SKEC conspired to commit a RICO violation.  Moreover, all of the claims relate to matters fully litigated in the Arbitration and decided by the Final Award that PEMEX is so assiduously attempting to avoid. The Arbitration established that there was no underbid, thus deciding, and up-ending, the fundamental premise of Plaintiffs' case.  In addition, the validity of ***each*** of the alleged fraudulent invoices and the approval of those invoices by PEMEX personnel was scrutinized in the Arbitration and ultimately decided in the Final Award.  Thus, the Amended Complaint is simply PEMEX attempting to relitigate the Final Award in this Court.  This is not a RICO case, it is a bilateral dispute that PEMEX already lost.

As in the original Complaint, PEMEX's allegations of bribery are unidentified and unspecified – even though the bribes were allegedly paid to PEMEX officials.  PEMEX attempts to fill this gaping pleading deficiency by now alleging that bribes purportedly paid in late 2004 –

---

over certain Defendants, in order to eliminate the distraction of spurious RICO claims and to protect its own rights and reputation, SKEC did not contest personal jurisdiction for purposes of this case and sought dismissal.  In addition, under the Court's Individual Rule of Practice 2.A., the Motion to Stay was not properly before the Court.  In any event, Plaintiffs have abandoned that motion, having failed to raise it at any point since filing it.

NEWYORK 8856530

*well after* the Project had ended and the Arbitration began – somehow influenced PEMEX's

approval of invoices *two to four years before*.  Further complicating PEMEX's theory is that

PEMEX in fact rejected these cost overrun and extra work claims after reviewing them at the

time.  That was why these claims were part of the Arbitration and why PEMEX cannot create a

causal connection between any alleged bribe and its alleged damages.  Vague allegations about

after-the-fact bribes cannot change this, nor can new "testimony" which provides no details

about when, by whom and to whom any alleged bribes were paid.

The Amended Complaint, such as it is, should be dismissed for many reasons:

- Despite a desperate attempt to manufacture some sort of U.S. connection, the Amended Complaint fails to plead a U.S. nexus sufficient to support a domestic RICO claim, a fatal deficiency under the Second Circuit's decision in Norex Petroleum Ltd. v. Access Indus., Inc., 631 F.3d 29, 33 (2d Cir. 2010).

- The claims made by PEMEX are simply a rehash of claims that already were – or should have been – raised and decided in the Arbitration.  One needs look no further than the arbitration awards to confirm this.  Consequently, res judicata bars PEMEX from bringing these claims now.

- The Amended Complaint purports to allege predicate acts of wire fraud.  However, the Amended Complaint fails to plead: (i) a plausible fraudulent scheme; (ii) a sufficient link between the alleged underbid, fraudulent invoices and bribery; (iii) the alleged acts of bribery with any specificity; or (iv) that SKEC knew of or intentionally participated in the claimed scheme.  Nor are PEMEX's claims based on the intangible right to honest services available to foreign parties.

- The Amended Complaint also fails to plead various other necessary elements of RICO, including: (i) that Defendants' conduct proximately caused PEMEX's harm or damages; (ii) a pattern of racketeering activity; and (iii) an agreement to violate RICO's substantive provisions.

- PEMEX also fails to plead a fraud claim.

- The claims made in the Amended Complaint are also time barred.

Remarkably, despite having had five months and two amendments to improve its

Complaint, changing the entire statutory basis for its claims, inventing an entirely new alleged

3

"scheme," and quadrupling the length of its Complaint, PEMEX's RICO allegations suffer from the same flaws as its initial filing.  PEMEX is desperate to relitigate as RICO claims matters already decided in an Arbitration that PEMEX lost badly.  The Court should not allow this, and should dismiss the Amended Complaint as futile on its face as quickly as possible.

## BACKGROUND

### The Mexican Project And Bidding

In 1996, PEMEX sought bids on a project to modernize and expand the Cadereyta refinery in Mexico.  (Am. Compl. ¶ 13)  To bid on the Project, SKEC, a South Korean company, Siemens, a German company, and non-defendant Grupo Tribasa, a Mexican company, formed CONPROCA, a consortium incorporated under Mexican law.  (Id. at ¶ 14)

Final bidding in November 1997 pitted CONPROCA against a consortium led by MitsubishiCo/Mitsui (the "Mitsubishi Consortium").  (Id.)  CONPROCA's bid required an investment by PEMEX of $1.382 billion and semi-annual payments of approximately $123 million, versus a $2.615 billion investment and semi-annual payments of approximately $223 million for the Mitsubishi Consortium.  (Id. at ¶ 15)  During the bidding process, PEMEX engaged an independent consultant to determine the maximum amount PEMEX should expend on the Project.[2]  After reviewing the technical requirements of the Project, PEMEX's own

---

[2]     See Award on Liability dated December 17, 2008 (the "Liability Award"), Declaration of David G. Hille dated May 24, 2013 (hereinafter, "Hille Decl.") Ex. 1, p. 15-16.  The Final Award and the Liability Award from the Arbitration already are matters of record before the Court in the Confirmation Proceedings.  PEMEX's Amended Complaint liberally refers to facts and documents addressed in the Final Award, which incorporates by reference the Liability Award, and in deciding this motion the Court may consider both awards in full.  See, e.g., Monsieur Touton Selection, Ltd. v. Future Brands, LLC, No. 06-civ-1124 (SAS), 2006 WL 2192790, at *2 n. 24 (S.D.N.Y. Aug. 1, 2006) ("[T]he facts set forth in this section are drawn from the public records of the prior proceedings submitted by defendants, which the Court may consider even on a motion to dismiss pursuant to Rule 12(b)(6)."); Blue Tree Hotels Inv. (Can.) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004) (court may consider documents referenced in complaint).  In addition, courts routinely consider arbitration awards on the motion to dismiss when a res judicata defense is raised by the defendant.  See, e.g., Feitshans v. Kahn, No. 06 Civ. 2125 (SAS), 2006 WL 2714706, at *2 (S.D.N.Y. Sept. 21, 2006) (dismissing claims as barred by res judicata and citing to and quoting from arbitration award); Battle v.

4

consultant opined that PEMEX should make no more than a $1.350 billion investment in the Project with semi-annual payments of $158.4 million or less – amounts extremely close to what PEMEX now calls CONPROCA's "underbid."  (Liability Award, Hille Decl. 1, pp. 15-16) PEMEX subsequently awarded the Project to CONPROCA.  (Am. Compl. ¶ 17)

**The Project Contracts**

In November 1997, CONPROCA, PEMEX and PR executed in Mexico two contracts governing work on the Project (the "Contracts").  (Id.)  The Financed Public Works Contract ("COPF") established the work to be performed.  (Id. at ¶ 18)  The Unit Price Public Works Contract ("COPPU") governed the additional compensation that CONPROCA would receive for any work that might be requested or found necessary that was not within the defined scope of the COPF.  (Id. at ¶ 19)   The Contracts required arbitration of all "disputes or petitions arising in connection" with the Contracts.[3]

**PEMEX Creates A U.S. Master Trust**

In November 1998, PEMEX and Bank of New York Mellon created the PEMEX Project Funding Master Trust (the "Master Trust") which PEMEX represented was designed to administer the financing arrangements relating to "various" of PEMEX's PIDIREGAS projects, only one of which was the Cadereyta Project. (Am. Compl. ¶¶ 32-33)  As such, from 1998-2008, *all* of PEMEX's U.S. debt financings relating to long-term infrastructure projects were entered

---

Assocs. for Women's Med. PLLC, No. 05 Civ. 8373 (DC), 2006 WL 2642137, at *1 n. 1 (S.D.N.Y. Sept. 15, 2006) (dismissing RICO claims as barred by res judicata and considering arbitration award).

[3]      COPF, Hille Decl. Ex. 3, Clause 37; COPPU, Hille Decl. Ex. 4, Clause 19.

5

into via the Master Trust, and from 2004-08, **all** of its SEC-registered debt issuances were made

via the Master Trust, as well.[4]

### PEMEX Enters Into Additional Contracts In Mexico
### Relating To Additional Work And Costs On The Project

Under the Contracts, CONPROCA performed substantial work in Mexico, including,

inter alia, the engineering, procurement, construction and start-up of new plant units and the

modernization and expansion of pre-existing plant units.  PEMEX has recognized in this Court

that no part of the Project work involved the United States and has not pled otherwise in this

action.[5]  As PEMEX has reported publicly, the Cadereyta Refinery has been operational and

profitable for PEMEX, with output levels of approximately 171,000 barrels a day, or 15% of

PEMEX's daily total refined output.[6]

During the Project, several additional work order requests were presented by

CONPROCA to PEMEX under the COPPU.  (Am. Compl. ¶¶ 21 and 30; Liability Award, Hille

Decl. Ex. 1, p. 17)  With respect to this additional work as well as expenses incurred due to

Project delays and disruptions, between July 2000 and January 2001, the parties entered into the

additional agreements referenced in the Amended Complaint at ¶¶ 20, 26 and 30 in Mexico

under Mexican law.   These agreements allowed CONPROCA to invoice for additional work

and expenses, and PEMEX to make provisional payments on those invoices while reviewing

---

[4]     PEMEX, 2010 Annual Report (Form 20-F) (June 30, 2011), available at:
        http://www.sec.gov/Archives/edgar/data/932782/000119312511178804/d20f htm (hereinafter "PEMEX 2010
        Annual Report"), Hille Decl. Ex. 11, pp. 124, 179.  The Court "may take judicial notice of the contents of
        relevant public disclosure documents required to be filed with the SEC…."  Kramer v. Time Warner Inc., 937
        F.2d 767, 774 (2d Cir. 1991).

[5]     PEMEX's Memorandum of Law in Support of Motion to Dismiss at 1, CONPROCA, S.A. de C.V. v. Petróleos
        Mexicanos & Pemex-Refinación, No. 11-civ-9165 (LLS) (S.D.N.Y. July 7, 2012), ECF No. 17.

[6]     PEMEX, 2011 Annual Report (Form 20-F) (April 30, 2012), available at:
        http://www.sec.gov/Archives/edgar/data/932782/000119312512196434/d339084d20f htm (hereinafter
        "PEMEX 2011 Annual Report"), Hille Decl. Ex. 12, p. 48.

them. [7]  As omitted in the Amended Complaint – but confirmed in the agreements and the

Arbitration awards – to the extent PEMEX then disallowed these invoices it recovered the money

it had paid by drawing on bonds CONPROCA had to post under these agreements in Mexico.

(Liability Award, Hille Decl. Ex. 1, pp. 341-42; DAA, Hille Dec. Ex. 5, p. 3; CWA, Hille Dec.

Ex. 6, p. 3; DEPA, Hille Dec. Ex. 8, p. 6 )  Thus, each of the invoices noted was subject to

review by PEMEX *before* the Arbitration – and in many cases PEMEX did not approve them

and in some cases drew down on CONPROCA's bonds – and each of these invoices was then

litigated and adjudicated *in* the Arbitration.

---

[7]    The agreements referred to in the Amended Complaint are properly considered by the Court on a Motion to Dismiss.  See, e.g., Int'l Audiotext Network, Inc. v. AT&T Co., 62 F.3d 69, 72 (2d Cir. 1995) ("Although the amended complaint in this case does not incorporate the Agreement, it relies heavily upon its terms and effect; therefore, the Agreement is 'integral' to the complaint, and we consider its terms in deciding whether [plaintiff] can prove any set of facts that would entitle it to relief.").  In July 2000, PEMEX and CONPROCA entered into the Debt Acknowledgement Agreement (the "DAA").  The Arbitration refers to this agreement interchangeably as the Debt Acknowledgement Agreement and the "Provisional Payment Agreement of July 7, 2000." (Am. Compl. ¶ 20; Liability Award, Hille Decl. Ex. 1, p. 11; DAA, Hille Dec. Ex. 5)  The DAA was signed in Mexico, is governed by Mexican law and is subject to arbitration.  (DAA, Hille Dec. Ex. 5, p. 5)  This agreement recognized that CONPROCA had submitted additional work orders for review and provided that PEMEX would make a provisional payment to CONPROCA while reviewing the work orders already submitted by CONPROCA.  (Id. at 1-3)  Under the DAA, CONPROCA issued Invoice 501.  (Am. Compl. ¶ 20)  PEMEX paid a portion of this invoice using both Mexican and New York accounts.  (Id. at ¶ 45)  When CONPROCA incurred additional costs relating to completing the Project (Id. at ¶ 21) and expenses due to delays and disruption in the Project, CONPROCA, in August 2000, submitted a claim request to PEMEX.  (Id. at ¶ 21)  To address this claim, in late 2000, PEMEX and CONPROCA entered into: (i) the Complementary Works Agreement ("CWA") governing the review of the additional work amounts (Am. Compl. ¶ 26; Hille Decl. Ex. 6); (ii) the Critical Event Adjustment Agreement extending the timeline for certain Project milestone dates ("CEAA") (Am. Compl. ¶ 29; Hille Dec. Ex. 7); and (iii) the Direct Expense Payment Agreement ("DEPA") governing the review of the expenses relating to Project delays and disruptions (Am. Compl. ¶ 30; Hille Dec. Ex. 8).  Each agreement was signed in Mexico, is governed by Mexican law and is subject to arbitration.  (CWA, Hille Decl. Ex. 6, p. 6; CEAA, Hille Dec. Ex. 7, p. 3; DEPA, Hille Dec. Ex. 8, pp. 9-10)  Also, to secure the possible return of the provisional payments provided under the CWA and the DEPA, the agreements required CONPROCA to post bonds in Mexico (the "CWA and DEPA Bonds").  (CWA, Hille Decl. Ex. 6, p. 4; DEPA, Hille Dec. Ex. 8, p. 6)  Under the CWA, CONPROCA submitted and PEMEX initially paid Invoices 525 and 532 (using both Mexican and New York accounts) (Am. Compl. ¶ 27, 45), but then, after review, refused CONPROCA's claims for these amounts and drew down on the bonds CONPROCA had posted.  (Liability Award, Hille Decl. Ex. 1, pp. 341-42)  Under the DEPA, CONPROCA submitted and PEMEX initially paid Invoice 533 (using both Mexican and New York accounts) (Am. Compl. ¶¶ 30, 45), but then, after review, refused CONPROCA's claims and drew down on CONPROCA's bond.  (Liability Award, Hille Decl. Ex. 1, pp. 341-42 )  Finally, in January 2002, CONPROCA submitted three invoices to PEMEX for other additional works under the COPPU.  (Am. Compl. ¶ 31)  PEMEX, through PR, ultimately paid these invoices from Mexican and New York accounts.  (Id. at ¶ 45)

7

**The Ten-Year International Arbitration**

CONPROCA commenced the Arbitration in September 2001 with respect to all its claims for additional work on the Project and for other costs and expenses incurred due to Project delays and disruptions.  (Liability Award, Hille Decl. Ex. 1, p. 22)  Work on the Project ended in August 2002.  (Id. at 21)

In the Arbitration, the parties asserted numerous claims and counter-claims that covered, inter alia, all seven invoices at issue in the Amended Complaint.  (Id.)  CONPROCA's claims included requests for rulings that: (i) CONPROCA was entitled to compensation for additional works and delays and disruptions, including the various payments made under the DAA, CWA, DEPA and January 2002 Invoices; (ii) PEMEX caused delays and disruptions to the Project; and (iii) PEMEX's reclamation of the provisional payments under the CWA and DEPA (through its bond drawdowns) was invalid.  (Id. at 30-38, 341-42)  PEMEX's counter claims included, inter alia, requests for rulings that: (i) PEMEX had properly exercised the CWA and DEPA Bonds; (ii) CONPROCA's claims as to the CWA and DEPA were invalid; and (iii) CONPROCA must return the amounts paid under the DAA.  (Id. at 38-39)  The parties submitted numerous pleadings, dozens of witness statements, multiple expert reports and produced hundreds of thousands of documents in support of the claims.  (See id. passim; Final Award, Hille Decl. Ex. 2 passim)

The liability phase of the Arbitration lasted until December 2008, and culminated in a more than 500-page award.  (Liability Award, Hille Decl. Ex. 1, pp. 22-30)  The Liability Award included findings that: (i) CONPROCA had not underbid the Project (id. at 15-16, 495-96); (ii) CONPROCA properly sought payments for additional works under the COPPU via, inter alia, the DAA and CWA (id. at 107-20, 314-42); (iii) CONPROCA had properly sought

reimbursement for costs related to Project delays and disruptions via, inter alia, the DEPA (id. at 465-73); and (iv) PEMEX had unlawfully exercised the CWA and DEPA Bonds (id. at 341-42).

The quantum phase of the Arbitration lasted from January 2009 until October 2011, and culminated in the Final Award incorporating the Liability Award findings and awarding various amounts to the Parties, with a gross award to CONPROCA including interest and taxes in excess of $500 million.  (Final Award, Hille Decl. Ex. 2)  The Final Award found, inter alia, that CONPROCA had performed more than $82.1 million in additional and value added works for the Project and also awarded CONPROCA amounts relating to: (i) PEMEX's unlawful drawdowns of the bonds posted by CONPROCA; and (ii) PEMEX's delay and disruption of the Project.  (Id. at 169-71, 402)  As described further below, these are the claims covered by the invoices PEMEX attempts to again put at issue here.

### The Confirmation Proceedings

In December 2011, CONPROCA brought proceedings in this Court to confirm the Final Award (the "Confirmation Proceedings").[8]  PEMEX filed a motion to dismiss the Confirmation Proceedings in July 2012.[9]  CONPROCA submitted a motion to confirm the Final Award in August 2012.[10]  Briefing was complete as of October 2012.

### The RICO Complaint And Proceedings To Date

Plaintiffs filed the original Complaint on December 12, 2012.  (Docket 1)  Rather than serve the Complaint, Plaintiffs immediately sought to stay this case.  (Docket 2-3)  In order to

---

[8]   CONPROCA's Petition to Confirm Arbitration Award, CONPROCA, S.A. de C.V. v. Petróleos Mexicanos & Pemex-Refinación, No. 11-civ-9165 (LLS) (S.D.N.Y. Dec. 14, 2011), ECF No. 1.

[9]   PEMEX's Notice of Motion to Dismiss Petition to Confirm Arbitration Award, CONPROCA, S.A. de C.V. v. Petróleos Mexicanos & Pemex-Refinación, No. 11-civ-9165 (LLS) (S.D.N.Y. July 12, 2012), ECF No. 16.

[10]   CONPROCA's Notice of Motion to Confirm Arbitration Award, CONPROCA, S.A. de C.V. v. Petróleos Mexicanos & Pemex-Refinación, No. 11-civ-9165 (LLS) (S.D.N.Y. Aug. 17, 2012), ECF No. 21.

move the case forward, Defendants waived service and filed motions to dismiss.  (Docket 8-19)

After conceding that they had missed the deadline to oppose the motion, Plaintiffs requested a

20-day extension to file an amended complaint (until April 18).  (Docket 23)  The day that

amended complaint was due, Plaintiffs requested a further 20-day extension, but filed a

provisional amended complaint and dismissed CONPROCA from the case.  (Docket 30-32)  On

May 8, Plaintiffs placed a copy of the Amended Complaint in the night drop box of the Court.

(Docket 34)  Plaintiffs attempted to serve Defendants via email, despite the fact that neither

Defendant had agreed to electronic service.  See Fed. R. Civ. P. 5(b)(2)(e).  The Amended

Complaint was also unavailable on PACER until May 13, because Plaintiffs failed to provide the

required PDF to the Clerk in violation of the Court's Rules.

Having had months to concoct this Amended Complaint, PEMEX still has failed to put

forward a viable RICO or fraud claim for the reasons described below.

## ARGUMENT

### I.   PEMEX'S RICO CLAIMS FAIL AS A MATTER OF LAW BECAUSE THE ALLEGED U.S. CONNECTIONS ARE INSUFFICIENT AND IRRELEVANT

To state a valid RICO claim, Plaintiffs must allege acts *in the United States* sufficient to

support the elements of a RICO claim.  Norex, 631 F.3d at 33.  Incidental acts relating to how

any party here chose to pay for or finance Project-related costs or work cannot support a RICO

claim, and the Amended Complaint must be dismissed with prejudice.

Whether a statute applies extraterritorially is a question addressed under Rule 12(b)(6).

Norex, 631 F.3d at 32.  In Morrison v. Nat'l Austl. Bank, Ltd., 130 S. Ct. 2869, 2877 (2010), the

Supreme Court recognized a presumption against the extraterritorial reach of federal laws,

holding that "unless there is the affirmative intention of the Congress clearly expressed to give a

statute extraterritorial effect, we must presume it is primarily concerned with domestic

10

conditions." (internal quotations and citation omitted).  Thus, "[w]hen a statute gives no clear

indication of an extraterritorial application, it has none."  Id. at 2878.

Morrison involved the extraterritorial application of the Securities Exchange Act of 1934.

The Second Circuit applied Morrison to RICO cases in Norex, holding that because RICO is

silent as to its extraterritorial application, it does not reach activities that occur substantially

outside the United States or have little or no U.S. connection.  Norex, 631 F.3d at 33.  Every

other court to consider the extraterritorial application of RICO after Morrison has decided

similarly.  See, e.g., United States v. Chao Fan Xu, No. 09-10189, 2013 WL 28392, at *3-4 (9th

Cir. Jan. 3, 2013); Republic of Iraq v. ABB AG, No. 08-cv-5951 (SHS), 2013 WL 441959, at

*23 (S.D.N.Y. Feb. 6, 2013); United States v. Philip Morris USA, Inc., 783 F. Supp. 2d 23, 27-

29 (D.D.C. 2011); Cedeño v. Intech Grp., Inc., 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010), aff'd

sub nom., 457 F. App'x 35 (2d Cir. 2012).

PEMEX alleges two U.S. contacts to support its RICO claim: (i) PEMEX's New York

based Master Trust and the movement of funds used to pay invoices through the trust; and (ii)

SEC registration of certain bonds purportedly used to finance the Project.  (Am. Compl. ¶¶ 8, 18,

32-36, 44-45)  Even if either of those "facts" were relevant to the frauds alleged – which they are

not – "simply alleging that some domestic conduct occurred cannot support a claim of domestic

application."  Norex, 631 F.3d at 33.  Indeed, even "the presence of domestic predicate acts does

not necessarily mean a given application of the RICO statute is territorial."  Republic of Iraq,

2013 WL 441959, at *23.  As the Supreme Court recognized, "it is a rare case of prohibited

extraterritorial application that lacks *all* contact with the territory of the United States.  But the

presumption against extraterritorial application would be a craven watchdog indeed if it retreated

to its kennel whenever **some** domestic activity is involved in the case." <u>Morrison</u>, 130 S. Ct. at 2884 (emphasis in original).

Rather, to determine whether the scant allegations of U.S. conduct alleged here are sufficient to create the required U.S. nexus depends on the focus of Congressional statutory concern and the "locus of the actions that are the 'objects of the statute's solicitude.'" <u>Republic of Iraq</u>, 2013 WL 441959, at * 21 (<u>quoting</u> <u>Morrison</u>, 130 S. Ct. at 2884). Here, dismissal is required because both the enterprise and pattern of racketeering activity alleged "primarily involve[d] foreign actors and foreign acts," and are insufficient to constitute a domestic RICO claim. <u>Norex</u>, 631 F.3d at 30.

First, PEMEX's alleged association-in-fact enterprise is comprised entirely of foreign parties, including Siemens (a German company), SKEC (a South Korean company) and a number of Mexican nationals. (Am. Compl. ¶¶ 4-5, 56-57) PEMEX's other claimed enterprise, CONPROCA, is a Mexican company that performed services solely for PEMEX as to the Cadereyta refinery in Mexico. (<u>Id.</u> at ¶ 58)

Second, the alleged pattern of racketeering activity relates to a Project entirely in Mexico and involved only non-U.S. parties. (<u>Id.</u> at ¶¶ 1, 4-5, 13) The parties entered into all of the relevant Project Contracts in Mexico and each agreement is in Spanish and governed by Mexican law. (<u>Id.</u> at ¶¶ 13-31; <u>see</u> <u>supra</u> at 7 n. 7) CONPROCA submitted the relevant invoices to PEMEX in Mexico. (<u>Id.</u> at ¶¶ 20-31) PEMEX then reviewed and either approved or denied those invoice claims in Mexico. (<u>Id.</u> at ¶¶ 20-31) The alleged improper payment and bribes also all took place in Mexico, or at least there is no allegation that they took place elsewhere, and were allegedly paid to PEMEX employees there. (<u>Id.</u> at ¶¶ 38, 49, 52, 57)

12

The alleged transfer of funds into CONPROCA's New York bank account through the Master Trust is irrelevant to the alleged fraud, or incidental at best.  Indeed, the Master Trust was not even created until a year after CONPROCA bid on the Project – and, in any event, was established by PEMEX, not Defendants, and was used by PEMEX to manage the financing arrangements for "various" Mexican projects other than the Cadereyta Project.  (See supra at 5-6)  Thus, PEMEX cannot plead any necessary connection between payments made in New York, apparently for PEMEX's own convenience, to the fraudulent scheme allegedly carried out entirely in Mexico.  Indeed, CONPROCA could have sought financing and PEMEX could have submitted payments in any number of ways, with no effect on the alleged scheme whatsoever – proven by PEMEX in fact remitting some payments to CONPROCA through Mexican accounts.  (See supra at 7 n. 7)

In any event, it is well-settled under Norex and its progeny that U.S. bank accounts and wire transfers without significantly more are insufficient to support a domestic RICO claim.  In Norex, the court dismissed the plaintiff's RICO claims despite allegations that the defendants "used money transferred through the U.S. wires to bribe Russian officials."  Norex Petroleum Ltd. v. Access Indus., Inc., 540 F. Supp. 2d 438, 443 (S.D.N.Y. 2007).  Indeed, this case has a *weaker* U.S. nexus than that rejected in Norex, because the plaintiff in Norex also alleged that "U.S. defendants 'masterminded, operated, and directed' the illegal conduct."  Id.  No such allegations exist here.

Similarly, in Cedeño, 733 F. Supp. 2d at 472-74, the court dismissed RICO claims despite the allegation of "a wide ranging money laundering scheme that utilized New York based banks," because the "scheme's contacts with the United States . . . were limited to the movement of funds into and out of U.S.-based bank accounts."  Cedeño is particularly telling because

PEMEX's counsel in this action signed the briefs that successfully sought dismissal (and Second Circuit affirmance).[11]  For similar reasons, the Amended Complaint should be dismissed here.

The recent decision in Republic of Iraq, 2013 WL 441959, is also instructive.  There, the plaintiff alleged that U.S. and foreign defendants violated RICO by allegedly conspiring with Saddam Hussein's government to defraud the U.N. Oil-for-Food Program.  Despite U.S. contacts, including that certain defendants were U.S. entities, and the underlying program included New York locations, negotiations, bank accounts and U.S. wire transfers, the court concluded that the alleged enterprise was foreign and the pattern of racketeering was "focused abroad" because the alleged scheme was "primarily foreign," was "engineered" by foreign actors, and was "concerned with [foreign] oil, goods, and contracts."  Id. at *21-*23.  Dismissing the RICO claims, the court held:

> When foreign actors were the primary operators, victims, and structure of a RICO claim, courts in this Circuit have properly concluded that the claims were extraterritorial.

Id. at *24 (citing, inter alia, Norex, 631 F.3d at 32).

PEMEX does not even try to connect the fact that certain Project bonds were SEC-registered with PEMEX's claims here and those bonds do nothing to help PEMEX's RICO claims.  (Am. Compl. ¶ 37)  In In re Vivendi Universal, S.A. Sec. Litig., 765 F. Supp. 2d 512, 529 (S.D.N.Y. 2011), a case arising out of the U.S. securities laws, the Court dismissed as extraterritorial claims against a foreign issuer, despite the defendant having registered

---

[11]    At the district court, counsel argued that dismissal was appropriate, inter alia, because "the **only** acts [the defendant] allegedly committed in the United States involved the movement of money to U.S. bank accounts." Ruben Idler Osuna's Memorandum of Law in Support of Motion to Dismiss the Amended Complaint at 7, Cedeño v. Intech Grp., Inc., No. 09 Civ. 9716 (JSR) (S.D.N.Y.  May 24, 2010), ECF No. 40 (emphasis in original).  Before the Second Circuit, counsel relied on Morrison and urged dismissal because "[t]he facts in the Amended Complaint portray a complex corporate structure entirely based in Venezuela," and "[t]he only activity that took place in the U.S. was the usage of a New York and Florida bank account by certain appellees."  Answer Brief of Defendant- Appellee Ruben Rogelio Idler Osuna at 24-5, Cedeño v. Castillo, 10-3861-cv (2d Cir. Jun. 2, 2011), ECF No. 126.

NEWYORK 8856530

approximately **500 million** American Depository Receipts ("ADRs") with the SEC.  The court

further held that even if certain of the plaintiffs were U.S. citizens, the registration (or even

listing of certain securities on the New York Stock Exchange) was insufficient as a matter of law

to create the requisite U.S. nexus.  Id. at 530-33.  Similarly, in Morrison, the Supreme Court held

that the listing of ADRs on the New York Stock Exchange was not sufficient to create a nexus to

the U.S. warranting application of the U.S. securities laws, even though many of the alleged

fraudulent acts occurred here.  Morrison, 130 S. Ct. at 2884-85.  Thus, notwithstanding

PEMEX's weak effort to allege a U.S. nexus, there is no claim that the RICO statute can reach

and the Amended Complaint should be dismissed with prejudice.

## II.   PEMEX'S CLAIMS ARE BARRED BY RES JUDICATA

The voluminous Final Award followed a ten-year Arbitration that addressed the claims

made in all of the invoices PEMEX now challenges.  As such, PEMEX is barred by the

Arbitration and Final Award from re-litigating all these claims relating to the Project.

"It is well settled that [the doctrine of res judicata] serves to bar certain claims in federal

court based on the binding effect of past determinations in arbitral proceedings."  Pike v.

Freeman, 266 F.3d 78, 90 (2d Cir. 2001).  Res judicata will apply where, as here, "'(1) the

previous action involved an adjudication on the merits; (2) the previous action involved the

[parties] or those in in privity with them; [and] (3) the claims asserted in the subsequent action

were, or could have been, raised in the prior action.'"  Pike, 266 F.3d at 91 (quoting Monahan v.

N.Y.C. Dep't of Corr., 214 F.3d 275, 284-85 (2d Cir. 2000)).

There is no question that the Arbitration involved an adjudication on the merits.

Moreover, although not parties to the Arbitration, both Siemens and SKEC were in privity with

CONPROCA, having formed it under Mexican law.  See Feitshans v. Kahn, No. 06 Civ. 2125

15

(SAS), 2006 WL 2714706, at *4 (S.D.N.Y. Sept. 21, 2006) (precluding claims on res judicata

grounds where claims were previously decided in an arbitration and defendants in the civil action

were sole owners of the defendants in that arbitration).

Lastly, PEMEX did raise and/or could have raised these claims, if at all, during the

Arbitration.  "Whether a claim that was not raised in the previous action could have been raised

therein depends in part on whether the same transaction or connected series of transactions is at

issue, and whether the same evidence is needed to support both claims."  Pike, 266 F.3d at 91

(internal citation and quotation omitted).  Thus, "the question is whether the claim was

sufficiently related to the claims that were asserted in the first proceeding that it ***should have***

***been*** asserted in that proceeding."  Id. (emphasis in original).  "According to the transactional

approach for determining the preclusive effect of a prior action, multiple claims based upon a

single contract are considered part of the same transaction" for purposes of a res judicata

analysis.  Feitshans, 2006 WL 2714706, at *4 (internal citations and quotations omitted).

Batlle v. Assocs. for Women's Medicine PLLC, No. 05 Civ. 8373 (DC), 2006 WL

2642137 (S.D.N.Y. Sept. 15, 2006) is instructive.  The plaintiff, a doctor, brought RICO claims

against the defendants, a medical practice group and others, alleging, inter alia, that a

memorandum of understanding ("MOU") entered into by the parties was fraudulent and did not

govern his relationship with the defendants.  Id. at *2.  Prior to the plaintiff filing his RICO suit,

the parties had already completed two arbitrations adjudicating a number of issues between them.

Id.  In dismissing the RICO claims, the court held that "[a]lthough couched under the guise of

RICO and fraud allegations, plaintiff's claims in [his] complaint [we]re nearly indistinguishable

from the claims he asserted in the arbitration proceeding."  Id. at *4.  For example, the plaintiff

had argued in both the arbitration and the RICO suit that the MOU was fraudulent.  Id.

16

Consequently, the court found that the "fact that the current action is camouflaged under RICO and fraud allegations does not conceal its true nature" and dismissed the RICO claims as barred by res judicata.  Id. at *5.

PEMEX's RICO claims fail for similar reasons here.  PEMEX alleges that in "order to obtain the Cadereyta Project, Siemens and SKEC, working through CONPROCA, presented a significantly lower economic proposal than their only other remaining competitor."  (Am. Compl. ¶ 37)  PEMEX goes on to allege that "[h]aving won the Project, Defendants devised a plan to manufacture a series of cost overruns the payment of which would allow them to make up the financial shortfall incurred by submitting an economically unrealistic bid" (id. at ¶ 38) and that Defendants "bribed several individuals at PEMEX," in order to: (i) secure additional agreements which "created a supposedly 'legal framework' for the payment of cost overruns" (id. at ¶ 39); and (ii) "facilitate[] the preparation, approval, and processing of several invoices related to the cost overruns" (id. at ¶ 40).

To support its allegations, PEMEX relies on: (i) the vast difference in bids between CONPROCA and the Mitsubishi Consortium; (ii) the approval by PEMEX employees of the DAA, CWA and DEPA; and (iii) the approval of several invoices by PEMEX employees related to those agreements between July 2000 and January 2002.  (Am. Compl. ¶¶ 15, 20-31)  However, both the RICO claims, and allegations in support of those claims, are based entirely on conduct relating to the Contracts and transactions at the heart of the Arbitration.

PEMEX's claims in the Arbitration included an allegation that the large discrepancy between CONPROCA's bid and the bid from the Mitsubishi Consortium evidenced a gross underbid by CONPROCA.  (Id. at ¶¶ 13, 37; Liability Award, Hille Decl. Ex. 1, pp. 495-96)  Thus, the Tribunal was well aware of the over $1 billion difference in the bid provided by

CONPROCA versus the bid provided by the Mitsubishi Consortium.  (Liability Award, Hille Decl. Ex. 1, pp. 15-16)  After reviewing all the evidence, the Tribunal found that an independent consultant **engaged by PEMEX** had provided PEMEX with a "closed envelope" appraisal stating that "the maximum semi-annual payment that Pemex was willing to make stood for USD$158.4 million dollars" and "the estimated investment amount of PEMEX was USD$1.350 billion dollars."  (Id. at 16)  Thus, CONPROCA's bid of $1.382 billion was remarkably close to the Project cost estimated by PEMEX's own consultant, and Mitsubishi's bid exceeded those limits by more than a billion dollars.  (Id. at 15-16)  Consequently, the Tribunal found that CONPROCA's bid was appropriate stating that:

> .  .  . although the proposal submitted by the other bidder [Mitsubishi] Consortium was too high above CONPROCA's one, this last one [the CONPROCA bid] was more coherent with the value PEMEX considered it should pay, according to the estimation of the expert hired for such purpose.  ***Therefore, it is not possible to affirm that there is underestimation in CONPROCA's proposal.***

(Id. at 496) (emphasis added)  In light of this finding in the Arbitration, it is astounding that PEMEX would assert in this Court an alleged fraudulent scheme premised on CONPROCA underbidding the Project.

PEMEX's current claim that the Project invoices and payments were fraudulent fares no better.  The primary focus of the Arbitration – occupying literally hundreds of pages of the Liability Award and Final Award – was adjudicating the propriety of claims and payments, including every invoice cited in the Amended Complaint.  (Liability Award, Hille Decl. Ex. 1, pp. 107-20, 295-342; Final Award, Hille Decl. Ex. 2, pp. 42-171, 366-82)  Although conspicuously omitted from the Amended Complaint, after making certain provisional payments, PEMEX refused to accept certain CONPROCA invoices and, instead, exercised its right to

18

drawdown bonds posted by CONPROCA and demand repayment of the provisional payments made under the CWA and DEPA.  (See supra at 7; Liability Award, Hille Decl. Ex. 1, pp. 341-42)

Consequently, CONPROCA commenced the Arbitration to seek determinations that: (i) amounts sought by CONPROCA for additional works and delays and disruptions – including those claimed in the invoices cited in the Amended Complaint – were proper; and (ii) PEMEX had improperly drawn on the CWA and DEPA Bonds.  (See supra at 8)  PEMEX, for its part, sought rulings that: (i) CONPROCA had never provided sufficient evidence to support the invoiced amounts, (ii) amounts sought were largely due to CONPROCA's underbid on the Project; and (iii) PEMEX had properly drawn on the bonds.  (See supra at 8).

Ultimately, the Arbitration Tribunal found in favor of CONPROCA on the vast majority of its claims, including with respect to *all* seven invoices raised in this RICO action:

- With respect to the work and amounts claimed in invoice 501 related to the DAA (Am. Compl. ¶¶ 43-45), the Tribunal found that PEMEX had issued work orders for the amounts claimed, had accepted the validity of the work performed, and could not question those amounts.  (See Liability Award, Hille Decl. Ex. 1, pp. 94-95, 107-112, 117-120; Final Award, Hille Decl. Ex. 2, pp. 381-82)

- With respect to the payments made on invoices 525, 532 and 533 related to the CWA and the DEPA (Am. Compl. ¶¶ 43-45), the Tribunal found that "[t]he value of the mentioned Agreements was reimbursed to PEMEX" (Liability Award, Hille Decl. Ex. 1, p. 341) and that CONPROCA was "entitled to all or part of the amounts foreseen in the [CWA and DEPA]" (Id. at 59, 342).  Thus, the Tribunal held that "[r]egardless [of] the way in which PEMEX had obtained the reimbursement of the provisionally paid amounts, such amounts shall be paid to CONPROCA."  (Id.)

- With respect to invoices 582, 583 and 584 related to claims from January 2002 (Am. Compl. ¶¶ 43-45), the Tribunal allowed CONPROCA to retain the amounts paid and considered such amounts in the computation of the amounts awarded for additional works.  (Final Award, Hille Decl. Ex. 2, pp. 381-82).

19

The Tribunal ultimately found: (i) over $82 million for additional works[12]; (ii) almost $190 million in delay and disruption costs; and (iii) over $9 million in interest and costs associated with PEMEX's exercise of the CWA and DEPA Bonds.  (Final Award, Hille Decl. Ex. 2, pp. 169-71; 402)  Thus, any and all issues regarding the allegedly fraudulent invoices were presented and adjudicated in the Arbitration, and PEMEX may not relitigate those claims here.

PEMEX also cannot sidestep the fact that these issues have all been adjudicated by raising claims of bribery now.  The only alleged bribes that PEMEX actually identifies in the Amended Complaint are those referenced in a complaint the SEC filed against Siemens on December 12, 2008 (the "SEC Complaint").  (Am Complaint, ¶¶ 4, 6, 46-53)  In its complaint, the SEC alleged FCPA violations by Siemens, including, inter alia, claims involving PEMEX.[13] In response, PEMEX did ***nothing*** in the Arbitration, notwithstanding that the Arbitration continued three more years in the quantum phase.  PEMEX did, however, publicly announce an investigation concerning the claims alleged in the SEC Complaint (the "PEMEX Investigation") to determine "whether any person acted improperly in the matters related to the SEC allegations."[14]  The PEMEX investigation continued until May 2010, when PEMEX announced that it was closed "due to insufficient proof."[15]

---

[12]   Given that the COPPU included a cap on payments for additional works and the ruling that CONPROCA could retain approximately $61 million under the DAA and the January 2002 Invoices (Id. at 381), the Tribunal limited CONPROCA's additional recovery for additional works to $19.3 million.  (Id. at 402)

[13]   SEC Complaint at ¶ 62, SEC v. Siemens Aktiengesellschaft, No. 08-cv-02167 (RJL) (D.D.C. Dec. 12, 2008), ECF No. 1.

[14]   PEMEX, Registration Statement (Form 6-K), (Jan. 27, 2009), available at: http://www.sec.gov/Archives/edgar/data/932782/00009502309001298/y74125e6vk htm, Hille Decl. Ex. 10, p. 6.

[15]   PEMEX 2010 Annual Report, Hille Decl. Ex. 11, p. 169.

NEWYORK 8856530

PEMEX had knowledge of the claims alleged by the SEC at least as early as December 2008, years *before* the Tribunal issued the Final Award in 2011 – which came *after* PEMEX ended its investigation.  Thus, PEMEX was free to raise improper payment or bribery claims in the Arbitration, but chose not to.  <u>Res judicata</u> prohibits PEMEX from relitigating issues it tried and lost *or* ignored in the Arbitration, and the Amended Complaint must be dismissed.

## III.   PEMEX FAILS TO PLEAD THE ELEMENTS OF ITS CAUSES OF ACTION

Under Rule 8, PEMEX generally must plead "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft</u> v. <u>Iqbal</u>, 556 U.S. 662, 678 (2009).  A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  <u>Id.</u>  Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief,'" and must be dismissed  <u>Id.</u> at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In addition, allegations of fraud, such as in the Amended Complaint, must be pled with particularity under Rule 9(b).  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The Second Circuit has read this requirement to mean that a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Rombach</u> v. <u>Chang</u>, 355 F.3d 164, 170 (2d Cir. 2004) (internal citation and quotations omitted); <u>Lundy</u> v. <u>Catholic</u>

Health Sys. of Long Island, Inc., 711 F.3d 106, 119 (2d Cir. 2013).  The "plaintiffs must [also] allege facts that give rise to a strong inference of fraudulent intent."  First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 178-79 (2d Cir. 2004).

"[W]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987); see also Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000) ("When fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts or omissions complained of by each defendant."). "Conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough."  Odyssey Re (London) Ltd., 85 F. Supp. 2d at 293; Lundy, 711 F.3d at 119 ("Bare-bones allegations do not satisfy Rule 9(b)").

The heightened pleading requirements of Rule 9(b) extend to RICO claims in which alleged predicate acts are based in fraud, including allegations of wire fraud.  First Capital Asset Mgmt., 385 F.3d at 178-79 ("allegations of fraudulent predicate acts[] are subject to the heightened pleading requirements of [Rule 9(b)]."); Lundy, 711 F.3d at 119 (applying Rule 9(b) to RICO claims alleging predicate acts of wire fraud).  Given the stigmatizing effect of RICO, the courts strictly apply Rule 9(b) in RICO suits.  In re Sumitomo Copper Litig., 995 F. Supp. 451, 455 (S.D.N.Y. 1998).

PEMEX's allegations are both implausible and fatally deficient as pled, and the Amended Complaint should be dismissed.  See Twombly, 550 U.S. at 570.

## A.    PEMEX FAILS TO PLEAD A RICO CLAIM

Courts look with particular scrutiny at civil RICO claims, "because the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants." Purchase Real Estate Grp. Inc. v. Jones, No. 05-civ-10859, 2010 WL 3377504, at *6 (S.D.N.Y. Aug. 24, 2010).  Thus, courts "strive to flush out frivolous RICO allegations at an early stage of the litigation." Id.  To avoid dismissal, the plaintiff must establish each element of the RICO claim as to each individual defendant.  Id.   To demonstrate a civil RICO claim under § 1964(c), the Second Circuit requires that "a plaintiff must plead, at a minimum, (1) defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation."  Lerner v. Fleet Bank, N.A., 318 F.3d 113, 120 (2d Cir. 2003) (internal quotation omitted).

### 1.    PEMEX Fails To Plead A Viable Predicate Act

To state a claim under section 1962(c), a complaint must allege facts showing that each defendant personally committed or aided and abetted the commission of at least two predicate acts (i.e., racketeering activity).  McLaughlin v. Anderson, 962 F.2d 187, 192 (2d Cir. 1992). The Amended Complaint appears to allege wire fraud in violation of 18 U.S.C. §§ 1343 and 1346.[16]  (Am. Compl. ¶ 60)

"A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme."  S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 633 (2d Cir. 1996); Lundy, 711 F.3d at 119.  Where a scheme to defraud is alleged, Rule 9(b) "requires the plaintiff to delineate, with adequate

---

[16]    In the Amended Complaint Plaintiffs loosely refer to mail fraud (Am. Compl. p. 1 and ¶¶ 41, 43), but do not invoke mail fraud as a predicate act or refer to 18 U.S.C. § 1341, the statutory provision relating to mail fraud.

NEWYORK 8856530

particularity, the specific circumstances constituting the overall fraudulent scheme." Calabrese v. CSC Holdings, Inc., 2003 WL 22052824, at *6 (E.D.N.Y. Aug. 13, 2003).  With respect to intent, "the complaint must 'provide some minimal factual basis' that gives rise to a **strong** inference of fraudulent intent." First Interregional Advisors Corp. v. Wolff, 956 F. Supp. 480, 485 (S.D.N.Y. 1997) (emphasis added).  In addition, to meet the requirements of Rule 9(b), "the complaint must allege the content of the fraudulent communication, who made and received the communication, where and when it took place, and describe why the information transmitted was fraudulent." First Interregional Advisors Corp., 956 F. Supp. at 485.

PEMEX alleges that Defendants intentionally participated in a scheme to defraud it of millions of dollars and the honest services of its employees by underbidding the Project with the objective of later manufacturing cost overruns to recoup "the financial shortfall incurred by submitting an economically unrealistic bid."  (Am. Compl. ¶¶ 37-38)  PEMEX further claims that as part of the scheme, Defendants allegedly bribed "several individuals at PEMEX" (id. at ¶ 38) who in turn provided a framework for processing and approving the cost overrun claims and allegedly fraudulent invoices submitted by CONPROCA.[17]  (Am. Compl. ¶¶ 39-40)

The scheme as alleged is implausible on its face because PEMEX has not provided any well pled factual support for allegations that: (i) CONPROCA underbid the Project; (ii) the invoices were fraudulent; (iii) the alleged bribes existed or were connected to the invoices at issue here; or (iv) that SKEC intentionally and knowingly participated in any scheme.  Without

---

[17]    PEMEX also alleges that Cesar Nava Vazquez, the General Counsel of PEMEX, "prevented PEMEX from cashing several letters of credit for $102.8 million, therefore serving as a conduit for furthering the RICO Defendants' criminal enterprise."  (Am. Compl. ¶ 57(g))  However, PEMEX does not allege how this seemingly isolated act related to the alleged fraudulent scheme.  Nor does PEMEX allege any act by Defendants that would have induced Vazquez to prevent PEMEX from enforcing the bonds.  (See Am. Compl. ¶ 6(e))  Indeed, there are any number of explanations for Vazquez's actions, including that PEMEX realized that it could not properly enforce the bonds.  Such scant pleading does not provide "enough facts to state a claim to relief that is plausible on its face," much less plead fraud with particularity under Rule 9(b). Twombly, 550 U.S. at 570.

NEWYORK 8856530

these integral facts, PEMEX's RICO claims cannot succeed and the Amended Complaint should be dismissed.

### i.        PEMEX Fails To Plead Underbidding

As discussed <u>supra</u> at 17-18, PEMEX's allegation that CONPROCA underbid for the Project is a fantasy.  PEMEX submitted this claim in the Arbitration and lost.  This allegation not only lacks the requisite detail to satisfy Rule 9(b), it is not even made in good faith.

### ii.        PEMEX Fails To Plead How The Invoices Were Fraudulent

PEMEX's fraudulent scheme also depends on the falsity of the invoices submitted by CONPROCA to PEMEX.  To succeed on a wire fraud claim, PEMEX must plead with particularity both the content of the fraudulent communications and how the information contained in those communications was fraudulent.  <u>First Interregional</u>, 956 F. Supp. at 485. PEMEX does neither.  PEMEX merely alleges that the Defendants "knowingly and willfully submitted false invoices, which the RICO Defendants knew to be false or misleading, to obtain payment."  (Am. Compl. ¶ 60)  PEMEX nowhere pleads facts to explain ***how*** the invoices were fraudulent, false or misleading.  (<u>See also</u> <u>id.</u> at ¶¶ 41-44, 57, 73)

Indeed, PEMEX has not provided a single fact or argument showing that the seven invoices cited in the Amended Complaint were in any respect fraudulent.  Given the Arbitration results, PEMEX cannot in good faith allege that the work performed by CONPROCA was unnecessary or faulty or that CONPROCA overcharged PEMEX for that work because ***all*** of these invoices were reviewed and upheld in the Arbitration.  (<u>See</u> <u>supra</u> at 18-20)  Indeed, the Cadereyta Refinery continues to be operational and profitable for PEMEX.[18]  Where, as here, a party "fail[s] to allege how th[e] statements made were fraudulent," the complaint must be

---

[18]      PEMEX 2011 Annual Report, Hille Decl. Ex. 12, p. 48.

dismissed.  Anatian v. Coutts Bank (Switz.) Ltd., 193 F.3d 85, 88 (2d Cir. 1999); see also

Procapui-Productores de Camaroes De Icapui Ltda. v. Layani, No. 07-CV-6627 (BSJ), 2008 WL

3338199, *3 (S.D.N.Y. Jan. 11, 2008) (dismissing complaint which failed to "specify which

entries or amounts on the invoices or payments were false or misleading, give particulars as to

the respect in which the invoices and payments were fraudulent, state on which date the allegedly

fraudulent entries and payments were made, or identify who among the Defendants were

responsible for particular statements or transfers.").

### iii.    PEMEX Fails To Plead Bribery

Although bribery allegations generally may avoid a heightened pleading standard, where

the bribery alleged is an integral component of the fraudulent scheme that is the basis of

PEMEX's wire fraud claims, Rule 9(b) does apply.  "By its terms, Rule 9(b) applies to all

'averments of fraud.'  This wording is cast in terms of the ***conduct alleged***, and is not limited to

allegations styled or denominated as fraud or expressed in terms of the constituent elements of a

fraud cause of action."  Rombach, 355 F.3d at 171 (emphasis added).  Thus, "[e]ven when a

plaintiff is not making a fraud claim, courts will require particularity in the pleading if the cause

of action is premised on fraudulent conduct."  Arthur R. Miller & Mary Kay Kane, 5A FED.

PRAC. & PROC. § 1297 (3d ed. 2004); see also In re DJK Residential LLC, 416 B.R. 100, 106-07

(Bankr. S.D.N.Y. 2009) (applying Rule 9(b) where RICO bribery allegations rested on "activities

that are fraudulent or deceitful in nature.").  Because PEMEX's fraud claims hinge on the

payment of bribes, its bribery allegations "sound in fraud" and must be plead with particularity.

To the extent that PEMEX attempts to plead alleged bribes on information and belief, the

complaint should be dismissed.  It is well-established that "Rule 9(b) pleadings cannot be based

upon information and belief."  DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242,

1247 (2d Cir. 1987).   Moreover, to the extent a limited exception exists when the alleged facts

are "peculiarly within the opposing party's knowledge" (id.), in order for this exception to apply,

"the allegations must be accompanied by a statement of the facts upon which the belief is

based."  Id.; see also Boritzer v. Calloway, No. 10-Civ-6264 (JPO), 2013 WL 311013, at *9

(S.D.N.Y. Jan. 24, 2013) (rejecting plaintiff's attempt to invoke exception where "the Complaint

is largely devoid of pleadings that explain why such facts might be unavailable to Plaintiffs and

solely in the hands of Defendants.").  Even when the exception is properly invoked, the courts

have repeatedly stated that "this does not mean that those matters may be pled lacking any detail

at all," especially in the context of RICO claims.  Satinwood, 385 F.3d at 179; see also Purchase

Real Estate, 2010 WL 3377504, at *8.

PEMEX provides no reason for pleading the alleged bribery – the very backbone of its

fraud claim – on information and belief.  Moreover, here the facts are peculiarly within the

knowledge of PEMEX.  It was PEMEX's employees who PEMEX says received the alleged

bribes, and it was PEMEX who put the infrastructure in place for approval of CONPROCA's

invoices.  In addition, after a ten-year Arbitration in which these very invoices were heavily

scrutinized, it defies logic that PEMEX has not located any evidentiary support for its claims.

Even assuming that PEMEX could plead bribery on information and belief, the Amended

Complaint cannot meet Rule 9(b).  The only bribes specified are not bribes at all, but the "three

separate illicit payments" made to a third party, i.e., not PEMEX, alleged in the SEC

Complaint.[19]  (Am. Compl. ¶ 46)  Even these claims – which Siemens never admitted – offer no

---

[19]   PEMEX alleges that the "SEC Complaint revealed facts evidencing that Siemens engaged in a systematic
practice of paying bribes to PEMEX to obtain business" (Am. Compl. ¶¶ 4, 47).  However, the allegations in
the SEC Complaint relating to PEMEX are limited to a single paragraph in which the SEC alleges the
existence of "three payments."  (SEC Complaint ¶ 62)  These three payments, to the extent they even
happened, hardly evidence a "systematic practice" of paying bribes to PEMEX.

specificity on time, place, amounts, who was involved, or whether the payments mentioned by the SEC even were linked to the Cadereyta Project – as opposed to the more broad SEC statement that the payments were made "in connection with three refinery modernization projects in Mexico." (SEC Complaint ¶ 62) There is certainly nothing that connects them to SKEC.

PEMEX attempts to leap this pleading hurdle by citing testimony purportedly given by Peter Muller, a former General Counsel of a Siemens affiliate in Mexico. (Am. Compl. ¶¶ 48-53) Despite Muller allegedly testifying for "approximately eight hours" (id. at ¶ 52), PEMEX neither provides a transcript of Muller's testimony nor directly quotes from it. In any event, Plaintiffs do not plead any facts that indicate or suggest that Muller was employed by Siemens Mexico during any of the relevant time periods or was involved himself in the Project. This may explain why Muller's testimony makes no sense.

According to PEMEX, Muller testified that he saw invoices from Siemens to Jaime Camil Garza in the amount of $2.6 million, or the same total amount of the three payments from late 2004 alleged in the SEC Complaint. (Am. Compl. ¶ 49) Thus, Muller only ever purportedly saw evidence of payments to a consultant named Garza, not bribes to any PEMEX officials. (Id.) Muller further testified that Siemens' Financial Director, Jose Querubin, told him that the monies paid to Garza "ended up in the hands of a high ranked official at PEMEX" with the goal "to obtain payment of substantial cost overruns that CONPROCA wanted to obtain on the Cadereyta Project." (Id.) Unfortunately for PEMEX, 2004 was already two to four years *after* CONPROCA submitted the invoices in question, and two years *after* work on the Project had completed. Indeed, no cost overruns or other payments were made to CONPROCA or Defendants after 2002. In fact, based on PEMEX rejecting various invoices and claims, the parties were already in the Arbitration over these very claims by then.

28

Nor does it make sense that the alleged payments were made to PEMEX employees after the fact to compensate them for having previously approved the invoices.  And PEMEX does not even allege that the two employees purportedly responsible for approving the invoices, Eduardo Vergara Cabrera and Maximo Tellez Rosas, received any bribe payments.  In addition, by 2004, PEMEX had taken back its payments by enforcing the CWA and DEPA Bonds and was arbitrating its right to keep those monies.  (See supra at 7, 18-19)  There would be absolutely no reason to pay bribes to PEMEX officials at that point.  Thus, the only bribes that PEMEX alleges with any small degree of specifics bear no plausible connection to PEMEX's fraud claims and fail to support PEMEX's RICO claim.

PEMEX also alleges that "corrupt payments allowed Defendants to **secure** additional agreements between PEMEX and CONPROCA, which created a supposedly 'legal framework' for the payment of the cost overruns."  (Id. at ¶ 39) (emphasis added)  However, the parties entered into the agreements in 2000 and 2001, more than ***three full years*** before the purported payments.  (See supra at 7 n. 7)  As such, there was no "legal framework" to establish in 2004 and it is impossible that the payments had any connection whatsoever to ***securing*** the agreements the parties had already entered into years earlier related to invoices that had long since been paid or rejected.

PEMEX's bribery claims also fail under Rule 8 because conclusory allegations of bribery, without well pled supporting facts, are insufficient.  See, e.g., Fuji Photo Film U.S.A., Inc. v. McNulty, 640 F. Supp. 2d 300, 318 (S.D.N.Y. 2009); Roberto's Fruit Market, Inc. v. Schaffer, 13 F. Supp. 2d 390, 399-400 (E.D.N.Y. 1998).  In Fuji Photo, the plaintiff alleged that the defendants committed predicate RICO acts, in part, by bribing an employee of Fuji Photo, but the plaintiff did not specify the amount of or otherwise plead any information pertaining to

the bribes.  640 F. Supp. 2d at 318.  In dismissing, the court held that the allegations of bribery were deficient as to all the defendants and failed to meet even Rule 8 because the plaintiff had "merely recite[d] the language of the bribery statute" and had not provided any facts supporting its conclusory claims.  Id. at 311, 318.  At a minimum, the plaintiff should have alleged *as to each bribe*: (i) the amount paid; (ii) when the payment was made; and (iii) how the payment was delivered, in order to provide adequate notice of its claim.  Id. at 318.

Similarly, in Schaffer, the court found the RICO bribery allegations insufficient where the plaintiffs failed to allege any facts supporting its claims.  The plaintiffs alleged that one set of the defendants bribed or made illegal campaign contributions to a group of town officials in order to receive lucrative contracts.  13 F. Supp. 2d at 398-99.  In dismissing, the court noted that the plaintiffs had provided "no indication of who paid the bribes, how the bribes were furnished, when and where the bribes were paid, and the approximate value of the bribes."  Id. at 399.

Here, PEMEX pleads nothing regarding the timing of the alleged bribes, who paid the bribes, the PEMEX recipients of the bribes, how the bribes were paid or the amount of any bribes.  This is exactly the same type of pleading rejected in Fuji Photo and Schaffer.  Moreover, Muller's confused alleged statements add none of the required detail to meet Rule 8.  PEMEX's failure to provide any supporting details is particularly troubling given the two amendments in this case and the two extensions of time sought so PEMEX could amend.  Even after five months and two amended complaints, PEMEX's allegations are still woefully inadequate to plead bribery.

### iv. PEMEX Fails To Plead How SKEC Had Knowledge Of Or Participated In The Alleged Scheme

The pleadings as to SKEC are particularly thin.  PEMEX fails to allege that SKEC had knowledge of and intentionally participated in any alleged scheme.  PEMEX does not plead any

facts supporting its allegation that the parties agreed to underbid the Project.  Nor does PEMEX

plead any facts supporting its claim that SKEC either participated in or knew about the alleged

bribes.  The only allegation by PEMEX that even remotely implicates SKEC is its claim that

"[e]ach invoice issued by CONPROCA and transmitted to PEMEX and the Master Trust through

a DOPI was signed and authorized by SKEC's General Manager."  (Am. Compl. ¶ 42)  In any

event, as noted above, PEMEX fails to plead how the invoices were fraudulent, much less that

Mr. Liew or anybody else at SKEC knew they were fraudulent when they submitted them.

**v.     PEMEX May Not Plead A Scheme To Deprive It Of The Intangible Right To Honest Services**

PEMEX attempts to allege predicate acts of wire fraud based on a claimed scheme to

deprive it of the honest services of its employees through acts of bribery by Defendants.  (Id. at ¶

61(b)).  As shown above, however, PEMEX fails to plead facts to support the underlying scheme

to defraud.  In any event, the intangible right to honest services is not available to foreign parties.

Prior to 1987, federal courts interpreted the mail and wire fraud statutes as criminalizing

"not only schemes for obtaining money or property, but also schemes to deprive another of 'the

intangible right of honest services.'"  United States v. Rybicki, 354 F.3d 124, 133 (2d Cir. 2003)

(en banc).  The case law established honest services claims with respect to a number of different

types of defendants, including, inter alia, government officials defrauding the public and private

actors who abused fiduciary duties by, for example, taking bribes.  Id.  However, in McNally v.

United States, 483 U.S. 350 (1987), the Supreme Court held that the mail fraud statute, and by

implication the wire fraud statute, only clearly protected property rights and, did not criminalize

schemes to deprive individuals of the intangible right to honest services.  Rybicki, 354 F.3d at

133-34 (citing McNally, 483 U.S. at 358-60).

31

In response to McNally, Congress enacted 18 USC § 1346 which provides that for purposes of wire fraud, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."  For purposes of disputes involving private parties, the Second Circuit has held that:

> [S]ection 1346, when applied to private actors, means a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the other person to whom the duty of loyalty is owed) secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer or other person.

Rybicki, 354 F.3d at 141-42.  The Supreme Court has limited the types of schemes covered by § 1346 to those involving bribery and kickbacks.  Skilling v. United States, 130 S. Ct. 2896, 2931 (2010).  Thus, to allege a violation of § 1346, a plaintiff must show: "(1) a [bribery or kick-back] scheme or artifice to defraud; (2) for the purpose of knowingly and intentionally depriving another of the intangible right of honest services as thus defined, (3) where the misrepresentations (or omissions) made by the defendants are material in that they have the natural tendency to influence or are capable of influencing the employer to change its behavior; and (4) the use of the mails or wires in furtherance of the scheme."  Rybicki, 354 F.3d at 147.

PEMEX's deprivation of honest services claim relies on the same bare and deficient allegations as its wire fraud claim based on the deprivation of property.  (See Am. Compl. ¶ 61) PEMEX simply alleges that Defendants "paid bribes to PEMEX officials for the purpose of knowingly and intentionally depriving PEMEX of the intangible right of those officials' honest services."  (Id.)  In addition, PEMEX alleges that "Defendants' bribes caused the relevant PEMEX officials to make misrepresentations as to the appropriateness of Siemens' and SKEC's

fraudulent invoices." (Id.)  Putting aside that the invoices were submitted by CONPROCA (not

Defendants) and putting aside that the invoices pre-dated the alleged bribes by two to four years,

PEMEX's claims fail because they have not sufficiently pled bribery or that the invoices were

fraudulent. (See supra at 25-30)

In any event, PEMEX cannot plead an honest services claim because § 1346 does not

protect foreign parties.  The decision in United States v. Giffen, 326 F. Supp. 2d 497 (S.D.N.Y.

2004) is instructive.  Defendant, the owner of a New York company, paid more than $78 million

in bribes to Kazakh government officials to win consulting work in Kazakh oil and gas

transactions.  Id. at 499.  The government brought charges, alleging use of the mail and wires to

"deprive the citizens of Kazakhstan of their intangible right to the honest services of their

political leaders." Id. at 500.  In determining whether § 1346 applied, the court noted that the

Second Circuit had already held that "Section 1346 did not criminalize deprivations of '*all*

intangible rights of honest services, whatever they might be thought to be.'" Id. at 505 (quoting

Rybicki, 354 F.3d at 137-38).  Rather, in enacting § 1346, "Congress was merely recriminalizing

the deprivation of the intangible right to honest services as it existed ***before*** McNally." Id.

(emphasis added).

Under this framework, the court dismissed the § 1346 charges because the "intangible

right to honest services for foreign citizens . . . was never recognized before McNally," nor had

any pre-McNally cases "appl[ied] the intangible rights theory to corruption in a foreign nation."

Giffen, 326 F. Supp. 2d at 506.  The court also noted that application of § 1346 "would require

[the] Court to determine what constitutes honest services in the Kazakh landscape" and would

result in "American notions of honesty in public service developed over two centuries to be

engrafted on Kazakh jurisprudence." Id. at 507.  Given the lack of pre-McNally support and the

NEWYORK 8856530

potential need to apply U.S. law in a Kazakh-centric fraud, the Court refused to sanction the "extraterritorial enlargement" of § 1346 and dismissed the charges.  Id. at 508.

Here, PEMEX's allegations relate entirely to alleged bribes paid in Mexico allegedly to Mexican government officials – i.e., PEMEX with respect to a Project entirely in Mexico.  As in Giffen, these claims would require an extraterritorial application of § 1346 to a foreign entity performing activities abroad.  Indeed, the conduct alleged here has less of a U.S. connection than that at issue in Giffen because neither Siemens nor SKEC is U.S.-based.  PEMEX cannot sufficiently allege a scheme to deprive it of the honest services of its employees and the Amended Complaint should be dismissed.

## 2. PEMEX Fails To Plead Causation

PEMEX also fails to plead a cause of action under § 1964(c) because it has not pled facts showing that the acts of Defendants are the proximate cause of its injury or damages.  It is well-settled that under § 1964(c) "plaintiff is required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well."  Hemi Grp., LLC v. City of New York, 130 S. Ct. 983, 989 (2010) (internal quotation and citation omitted); see also Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 234 (2d Cir. 1999) (same).  In evaluating a RICO claim for proximate causation "the central question . . . is whether the alleged violation led directly to the plaintiff's injuries."  Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006).  "A link that is too remote, purely contingent, or indirect is insufficient."  Hemi, 130 S. Ct. at 989 (internal quotations omitted).  Moreover, "when factors other than the defendant's [alleged predicate acts] are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions."  First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994).

34

Thus, PEMEX must link the predicate acts both to the alleged injury and claimed damages.  Here, PEMEX alleges that "individuals at CONPROCA fraudulently caused PEMEX to transfer millions of dollars to CONPROCA's bank account in New York.  As a consequence, Plaintiffs suffered millions of dollars in damages."  (Am. Compl. pp. 1-2)  However, PEMEX fails to plead both: (i) a plausible injury and resulting damages; and (ii) that Defendants' alleged conduct was the proximate cause of such injury and damages.

PEMEX appears to be alleging that its payment of the seven invoices submitted by CONPROCA somehow injured it.  (See Am. Compl. ¶¶ 64, 69, 74)  But, payment of the invoices is not injurious unless PEMEX has alleged facts showing that the amounts claimed in the invoices were somehow improper.  As discussed above, PEMEX has not done that, and indeed, these invoices were all upheld in the Arbitration which bars PEMEX from challenging them here.  As such, all PEMEX has really done is pay CONPROCA some of the money that is fairly due to it under the agreements signed by the parties.

Even if PEMEX could plead injury and damage, it has failed to show that Defendants' alleged conduct was the direct and proximate cause of that injury and damage.  The propriety of each of the seven invoices cited in the Amended Complaint was litigated in the Arbitration and ruled on by the Tribunal.  To the extent the Tribunal ruled that CONPROCA may keep the amounts paid to it under the invoices or that PEMEX must pay amounts not paid under the invoices, the Tribunal is an intervening cause of PEMEX's "injury" and "damage," thus breaking the direct causal chain between Defendants' alleged conduct and PEMEX's alleged injury. Having failed to allege injury or proximate cause of that injury or damage causation, the Amended Complaint should be dismissed. [20]

---

[20]    PEMEX also ignores its own actions as an intervening cause.  The doctrine of in pari delicto "forecloses recovery by a claimant that was a participant in the alleged wrong."  In re Parmalat Sec. Litig., 412 F. Supp. 2d

### 3.   PEMEX Fails To Plead A "Pattern" Of Racketeering Activity

The "heart of any RICO complaint is the allegation of a ***pattern*** of racketeering."

Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 154 (1987) (emphasis in

original).  In order to allege a pattern of activity, at minimum PEMEX must plead facts showing

that each defendant committed at least two predicate acts within a ten-year period.  18 U.S.C. §

1961(5); see also Satinwood, 385 F.3d at 178.  However, the statutory requirement of two

predicate acts "does not so much define a pattern of racketeering activity as state a minimum

necessary condition for the existence of such a pattern."  H.J. Inc. v. N.W. Bell Tel. Co., 492

U.S. 229, 237 (1989).  Therefore, only pleading two predicate acts may not be enough to

establish a pattern of activity.

Rather, "a plaintiff or prosecutor must show that the racketeering predicates are related

***and*** that they amount to or pose a threat of continued criminal activity."  Id. at 239 (emphasis in

original).  "Sporadic activity" and a showing of "two widely separated and isolated criminal

offenses," are not sufficient to meet this standard.  Id.  PEMEX's attempts to plead a pattern of

racketeering fail because it has not and cannot plead anything other than temporally limited and

sporadic conduct, at best.  Moreover, the "pattern," even as alleged, is nothing more than a ***single***

scheme with a ***single*** goal that PEMEX has artificially divided into subparts in order to attempt

to meet the RICO continuity requirements.

---

392, 400 (S.D.N.Y. 2006).  Thus, where a corporation "is alleged to have engaged in concerted illegal activity
with third parties for that corporation's own benefit, that corporation may not recover against its third-party co-
conspirators."  In re Am. Int'l Grp., Inc. Consol. Derivative Litig., 976 A.2d 872, 877 (Del. Ch. 2009).  Courts
in the Second Circuit and other Circuit courts have applied in pari delicto to RICO claims.  See, e.g., Parmalat,
412 F. Supp. 2d at 400-01; Rogers v. McDorman, 521 F.3d 381, 389 (5th Cir. 2008) (citing Official Comm. of
Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145 (11th Cir. 2006) and adopting the Eleventh
Circuit's recognition of in pari delicto as a defense to a civil RICO claim).  Here, PEMEX has stated that some
of the amounts allegedly paid by Siemens "ended up in the hands of a high ranked official in PEMEX."  (Am.
Compl. ¶ 49)  Moreover, PEMEX alleges a number of times that its employees, including employees that are
not alleged to have been co-conspirators in the claimed fraudulent scheme, approved the supplemental
agreements and the payment of the invoices at issue here.  (Am. Compl. ¶¶ 25, 28, 39, 57)

36

NEWYORK 8856530

The continuity requirement is met if the plaintiff adequately alleges conduct amounting to either a "closed-ended" or "open-ended" pattern of racketeering activity.  See GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 466 (2d Cir. 1995).  It is unclear from the Amended Complaint whether PEMEX is alleging open-ended or closed-ended continuity.  Regardless, PEMEX fails to plead either because: (i) the alleged scheme was inherently terminable; and (ii) PEMEX has pled no facts sufficient to show closed-ended continuity.

### i.      The Alleged Scheme Was Inherently Terminable

"To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." Satinwood, 385 F.3d at 180 (quoting Cofacrédit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999)); Purchase Real Estate, 2010 WL 3377504, at *9 (same).  Open-ended continuity does not exist where the racketeering activity is, by its nature, "inherently terminable" or has already terminated.  See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 186 (2d Cir. 2008) (no open-ended continuity where illicit activity has already completed); GICC, 67 F.3d at 466 (same).  Thus, "a serious, but discrete and relatively short-lived scheme to defraud" is not sufficient to allege open-ended continuity for purposes of RICO. Spool, 520 F.3d at 186 (quoting Cofacrédit, 187 F.3d at 244).

Here, PEMEX alleges that Defendants purposefully underbid the Project and then recouped the economic shortfall caused by the underbid by submitting fraudulent invoices during a discrete period of time for cost overruns on the Project, which then ended.  (Am. Compl. ¶¶ 37-40)  PEMEX alleges that Defendants secured the agreements creating the "legal framework" for the invoices and obtained approval of the invoices by bribing unidentified "individuals at

PEMEX."  (Id. at ¶¶ 38, 57)  As such, the alleged pattern by its nature was "inherently

terminable" – and, if it existed, by definition ended long ago.

Each of the invoices at issue was submitted by CONPROCA and paid or ultimately

rejected by PEMEX during the period 2000-2002.  (Id. at ¶¶ 43-45)  The only acts of alleged

bribery identified in the Amended Complaint took place in late 2004.  (Id. at ¶¶ 46)  According

to PEMEX's public statements, CONPROCA completed 99% of the work by December 2001[21],

the Arbitration had started by late 2001, and the Project was completed by August 2002.

(Liability Award, Hille Decl. Ex. 1, p. 21)  By necessity, any alleged pattern relating to approval

of allegedly false Project claims ended years ago during the period when the predicate acts were

allegedly committed.  Plainly, the alleged "scheme" was not open-ended.

### ii. PEMEX Cannot Plead A Close-Ended Scheme

Pemex also cannot plead that the alleged bribery constitutes a closed-ended pattern of

racketeering.  This is primarily a temporal question.  Spool, 520 F.3d at 184.  "[C]losed-ended

continuity can only be shown through conduct occurring over a substantial period of time."

GICC, 67 F.3d at 467 (internal quotation and citation omitted).  "Notably, [the Second Circuit]

has never found a closed-ended pattern where the predicate acts spanned fewer than two years."

Satinwood, 385 F.3d at 181.  But, "while two years may be the ***minimum*** duration necessary to

find closed-ended continuity, the mere fact that the predicate acts span two years is insufficient,

without more, to support a finding of a closed-ended pattern."  Id. (emphasis in original).

Although PEMEX alleges that the pattern of racketeering activity "began before 2000,

[and] continued through 2002" (Am. Compl. ¶ 60(d)), it pleads no ***facts*** showing when the

---

[21]     PEMEX, 2001 Annual Report (Form 20-F) (Dec. 2, 2002), available at:
http://www.sec.gov/Archives/edgar/data/932782/000104746902005278/a2095129z20-f.htm, Hille Decl. Ex. 9,
p. 44.

NEWYORK 8856530

scheme began and ended.  While PEMEX attempts to tie the pattern of racketeering activity to

CONPROCA's bid on the Project in 1997 and the payment of seven invoices from 2000 to 2002,

as discussed <u>supra</u> at 25-26, neither CONPROCA's bid nor PEMEX's approval of invoices

amounts to anything absent the alleged bribes.  Thus, PEMEX's pattern of racketeering activity

hinges on its pleading of the timing of the alleged bribes.  However, the Amended Complaint

provides no details as to the number of alleged bribes, the timing of those bribes or how those

bribes were accomplished.  PEMEX's unsupported allegations are so nebulous that it is

impossible to find closed-ended continuity.  As such, PEMEX cannot meet its pleading burden

and the Amended Complaint must be dismissed.  <u>See</u> <u>Merrill Lynch, Pierce, Fenner & Smith,</u>

<u>Inc.</u> v. <u>Young</u>, No. 91-civ-2923 (CSH), 1994 WL 88129, at *29 (S.D.N.Y. Mar. 15, 1994)

(dismissing RICO claims and noting that "[w]ithout any indication of when the [predicate acts]

occurred, it is impossible to discern whether the racketeering acts fall within a sufficiently long

period of time to satisfy the continuity requirement").

    "A scheme's duration alone, however, is not dispositive."  <u>Casio Computer Co., Ltd.</u> v.

<u>Sayo</u>, No. 98CV3772 (WK), 2000 WL 1877516, at *12 (S.D.N.Y. Oct. 13, 2000).  Courts also

consider "whether close-ended continuity exists by weighing a variety of non-dispositive factors,

including, *inter alia*, the length of time over which the alleged predicate acts took place, the

number and variety of acts, the number of participants, the number of victims, and the presence

of separate schemes."  <u>GICC</u>, 67 F.3d at 467.  "Courts in the Second Circuit have generally held

that where the conduct at issue involves a limited number of perpetrators and victims and a

limited goal, the conduct is lacking in closed-ended continuity."  <u>FD Prop. Holding, Inc.</u> v. <u>US</u>

<u>Traffic Corp.</u>, 206 F. Supp. 2d 362, 372 (E.D.N.Y. 2002); <u>see also</u> <u>Cont'l Realty Corp.</u> v. <u>J.C.</u>

<u>Penney Co., Inc.</u>, 729 F. Supp. 1452, 1455 (S.D.N.Y. 1990) (plaintiff failed to satisfy continuity

NEWYORK 8856530

where defendant's actions were narrowly directed towards a single allegedly fraudulent goal and the scheme involved one victim and one group of perpetrators).

Schlaifer Nance & Co. v. Estate of Andy Warhol, 119 F.3d 91, 98 (2d Cir. 1997) (affirming dismissal of RICO claims by Stanton, J.) is instructive. The plaintiff alleged a RICO scheme based on a licensing agreement. Attempting to plead a pattern of racketeering activity, the plaintiff alleged that the defendants engaged in a number of distinct acts including, inter alia: (i) fraudulently transferring the plaintiff's licensing rights to third parties; (ii) accepting payments from sublicensees without the plaintiff's approval; (iii) fabricating reasons to deny licensing approval for products going to the plaintiff; and (iv) threatening to assert a false fraud claim against the plaintiff. Although these act spanned more than three years, the Second Circuit affirmed this Court's dismissal because the acts all "related to a single contract and single scheme to defraud" and were therefore insufficient to support a finding of continuity. Schlaifer, 119 F.3d at 97-98. In so holding, the Second Circuit cautioned that "courts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO." Id.

Here, even if PEMEX had pled events occurring over a period lasting more than two years, every other non-dispositive factor weighs against a finding of continuity. As in Schlaifer, PEMEX's allegations all relate to an isolated contractual dispute between CONPROCA and PEMEX, namely the amount of money due CONPROCA for the Cadereyta Project. Indeed, as pled, PEMEX's RICO claims rely only on a single alleged "scheme" with a single goal of recouping the claimed underbid through allegedly false invoices. (See Am. Compl. ¶¶ 37-45)

Thus, although the Amended Complaint references a number of different contracts, invoices and payments (Id. at ¶¶ 20, 26, 30, 43-45), each contract, invoice and payment was only

40

a subpart of the same alleged scheme and could not constitute a "pattern" of racketeering

activity.  In addition, the alleged scheme was hardly complex or multi-faceted, nor did it require

numerous perpetrators, and it only resulted in an alleged injury to PEMEX.  At bottom, PEMEX

has done little more than take a single purported scheme with a limited goal and fragment it into

smaller subparts.  This is just what <u>Schlaifer</u> prohibits; indeed, "[v]irtually every garden-variety

fraud is accomplished through a series of wire or mail fraud acts that are 'related' by purposes

and spread over a period of at least several months.  So too, the [Plaintiffs'] RICO action is

nothing more than an ordinary fraud case clothed in the Emperor's trendy garb."  <u>In re Integrated

Res. Real Estate Ltd. P'Ship Secs. Litig.</u>, 850 F. Supp. 1105, 1148 (S.D.N.Y. 1993) (internal

citations and quotations omitted).  PEMEX's allegations do not plead a pattern of racketeering

activity, and the Amended Complaint must be dismissed.

### 4.      PEMEX Fails To Plead A RICO Conspiracy

In order to recover under § 1962(d), a plaintiff must: (i) plead an agreement to commit

predicate acts in violation one of RICO's substantive provisions under § 1962(a), (b) or (c); and

(ii) sufficiently allege a violation of §1962(a), (b) or (c).  18 U.S.C. § 1962(d); <u>see also</u>

<u>Cofacrédit, S.A.</u>, 187 F.3d at 244-45; <u>Satinwood</u>, 385 F.3d at 182.  PEMEX fails to do either.

"The core of a RICO civil conspiracy is an agreement to commit predicate acts."  <u>Young</u>,

1994 WL 88129, at *30 (quoting <u>Hecht</u> v. <u>Commerce Clearing House</u>, 897 F.2d 21, 25 (2d Cir.

1990)).  The plaintiff must "establish that the [defendants] agreed to form and associate

themselves with a RICO enterprise and that they agreed to commit two predicate acts in

furtherance of a pattern of racketeering activity in connection with the enterprise."  <u>Cofacrédit,

S.A.</u>, 187 F.3d at 244.  However, "the commission of the acts is distinct from an agreement to

commit them, and a violation of § 1962(d) requires different proof from a violation of §

41

1962(c)."  Casio Computer, 2000 WL 1877516, at *22.  Thus, "the plaintiff must allege that each defendant agreed to personally commit at least two predicate acts."  Odyssey, 85 F. Supp. 2d at 303.  The plaintiff must also show that "if the agreed-upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity."  Cofacrédit, S.A., 187 F.3d at 244-45.

Conclusory allegations of an agreement to violate RICO without well-pled factual support are insufficient.  See Adler v. Berg Harmon Assocs., 790 F. Supp. 1222, 1234 (S.D.N.Y. 2004) ("complaint must allege some factual basis for a finding of a conscious agreement").  "[A] RICO conspiracy allegation should be more than a conclusory add-on" and must "state with specificity what the agreement was, who entered into the agreement, when the agreement commenced, and what actions were taken in furtherance of it."  FD Prop. Holding, 206 F. Supp. at 373 (internal citations and quotations omitted).  In addition, a complaint must allege that "each defendant knowingly agreed to participate in the conspiracy" Fahlenbach v. Trans Pac. Capital (USA) Inc., No. 95-civ-8776, 1996 WL 22602, at *6 (S.D.N.Y. Jan. 19, 1996), including by providing "allegations of specific facts that each of the defendants, by words or actions, manifested an agreement to commit two or more of the predicate acts."  Com-Tech Assocs. v. Computer Assocs. Int'l, 753 F. Supp. 1078, 1092 (E.D.N.Y. 1990).

Here, PEMEX relies on boilerplate, alleging only that Defendants "conspired to engage in a pattern of racketeering activity" (Am. Compl. ¶ 3), and "willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) . . . , knew they were engaged in a conspiracy . . . [and] agreed to facilitate the Enterprise's scheme."  (Id. at ¶¶ 66-68)  This is akin to what was rejected in Adler, 790 F. Supp. at 1234.  There, the plaintiff alleged that "the defendants conspired among themselves to further the scheme to defraud . . .

42

[b]y knowingly and willingly participating in the conspiracy." Id.  The court held that this type

of pleading could not support a RICO conspiracy claim because it lacked "factual allegations

supporting an inference that the various defendants consciously agreed to become part of a RICO

conspiracy." Id.  Also as in Adler, PEMEX fails to plead any *facts* regarding the alleged

agreement, including the nature of the agreement, the purported involvement of each Defendant,

or how each Defendant, either "by words or actions," manifested a purported agreement to an

alleged bribery scheme.  Com-Tech, 753 F. Supp. at 1092.

Finally, PEMEX's conspiracy claim is based on an alleged violation of § 1962(c).  (Am.

Compl. ¶ 66)  As discussed above, PEMEX has failed to plead a § 1962(c) violation.  The

Second Circuit has held that a RICO conspiracy claim does not lie where, as here, Plaintiffs fail

to plead a violation of § 1962(a), (b) or (c).  See  Satinwood, 385 F.3d at 178; Discon, Inc. v.

NYNEX Corp., 93 F.3d 1055, 1064 (2d Cir. 1996), vacated on other grounds, 525 U.S. 128

(1998).

### B.     PEMEX FAILS TO PLEAD FRAUD

The Amended Complaint adds a new claim of fraud, alleging that unidentified invoices

were false for unidentified reasons resulting in PEMEX overpaying CONPROCA in an

unidentified amount. (Am. Compl. ¶¶ 70-74)  PEMEX does not state under what law they are

asserting their fraud claims.  Under New York law, PEMEX's fraud claim must be dismissed

because it is not pled with the requisite particularity and fails to state a claim.

### 1.     PEMEX Fails To Plead With Any Particularity

A common law fraud claim must be dismissed where, as here, it is not pled with the

particularity required under Rule 9(b).  See, e.g., Procapui-Productores, 2008 WL 3338199, at *5

(dismissing RICO and common law fraud claims under Rule 9(b)); see also Odyssey, 85 F. Supp.

2d at 293 (applying Rule 9(b) to common law fraud claim under English law), aff'd, 2 F. App'x 109 (2d Cir. 2001).  As previously discussed supra at 21, Rule 9(b) requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach, 355 F.3d at 170.

As discussed supra at 25-26, PEMEX's claim that several CONPROCA invoices were somehow fraudulent is pled entirely without the requisite particularity.  PEMEX pleads no facts about how any invoice was purportedly false, and does not allege any amount, whether in an individual invoice or collectively, that was purportedly false or an overpayment.  In addition, PEMEX does not identify which specific invoices were purportedly fraudulent or how many invoices underlie its claim – leaving it unclear whether PEMEX seeks to limit its claim to the seven invoices cited in the Amended Complaint .  (See Am Compl. ¶ 71 (referring to "several . . . invoices" generally))  PEMEX also provides no support for its allegations that bribes were paid in connection with certain invoices.  (See supra at 26-30)  Accordingly, PEMEX has failed to plead fraud with the particularity and the fraud claim must be dismissed.

## 2.     PEMEX Fails To State The Elements Of A Fraud Claim

PEMEX's vague and conclusory allegations also fail to state the elements of fraud, which require a plaintiff alleging fraud to state with particularity:  (1) a material, false representation, (2) made with the intent to defraud, (3) that is reasonably relied on by the plaintiff, and (4) thereby causes damages.  Carvel v. Ross, No. 09 CIV. 0722, 2011 WL 856283, at *20 (S.D.N.Y. Feb. 16, 2011) (citing Chanayil v. Gulati, 169 F.3d 168, 171 (2d Cir. 1999)); see also S.Q.K.F.C., 84 F.3d at 633 (2d Cir. 1996).

44

As noted above, PEMEX has failed to identify a single false statement in any invoice, much less a "material" misrepresentation as required.  Bui v. Indus. Enters. of Am., Inc., 594 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) ("Plaintiff's failure or refusal to specify any particular statement as allegedly fraudulent means that Plaintiffs are unable to allege that there has been a material representation or omission of fact.") (internal quotations omitted); Batlle, 2006 WL 2642137, at *6 (dismissing claims alleging the use of fraudulent documents as "fall[ing] well short of the heightened pleading standard" because "plaintiff fails to explain what documents were altered, how they were altered, and what was fraudulent about these documents").

PEMEX, a sophisticated oil company, also cannot allege that it paid sums to CONPROCA in "reasonable reliance" on (unidentified) false invoices because it expressly pleads that it separately reviewed the invoices with inside and outside auditors and made an independent decision on what to pay.  (Am. Compl. ¶¶ 22-28 )  As one New York court explained:

> The reasonableness of a claim of reliance must be considered in light of the plaintiff's sophistication. 'It is well established that where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.'

Terra Sec. Asa Konkursbo v. Citigroup, Inc., 740 F. Supp. 2d 441, 448 (S.D.N.Y. 2010) (quoting Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1541 (2d Cir. 1997), aff'd, 450 F. App'x 32 (2d Cir. 2011).  Indeed, the ultimate amounts owing were determined by the Arbitration – *not* by PEMEX's "reliance" on any invoice.  (See supra at 34-35)

Furthermore, PEMEX has not alleged any facts showing that Defendants, and particularly SKEC, acted with an "intent to defraud" because PEMEX's "fraud theory" impermissibly ignores that PEMEX's own consultants and the Arbitration found that CONPROCA did not

45

underbid the Project.  (See supra at 17-18)   Accordingly, PEMEX has failed to plead the elements of a fraud claim with the particularity required under Rule 9(b) and the claim must be dismissed.

In addition, to the extent the Court dismisses PEMEX's RICO claim, it should also dismiss PEMEX's common law fraud claim.  Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction."   PEMEX has not alleged any claim other than RICO over which this Court has original jurisdiction.  Thus, PEMEX's common law fraud claims cannot survive dismissal of its RICO claims. See First Capital Asset Management, Inc. v. Satinwood, Inc., 385 F.3d 159, 183 (2d Cir. 2004) (affirming district court decision to decline supplemental jurisdiction over state law claims after dismissing the RICO claim); Am. Home Mortgage Corp. v. UM Sec. Corp., No. 05 CIV. 2279 (RCC), 2007 WL 1074837, at *5 (S.D.N.Y. Apr. 9, 2007) ("Because the Court is dismissing Plaintiff's federal law RICO claims and because the remaining claims concern only state law, there is no longer any independent basis for federal jurisdiction in this action.  The Court declines to exercise supplemental jurisdiction over the remaining claims.").

## IV.   PEMEX'S RICO CLAIMS ARE TIME-BARRED

PEMEX's RICO and fraud claims – which are both based on the payment of allegedly fraudulent invoices 11 to 13 years ago – are barred by any applicable statutes of limitations.

### A.   THE RICO CLAIMS ARE TIME-BARRED

RICO's four-year statute of limitations "begins to run . . . when the plaintiff discovers – or should have reasonably discovered – the  alleged injury."  World Wrestling Entm't, Inc. v. Jakks Pac., Inc., 328 F. App'x 695, 697-98 (2d Cir. 2009); see also Koch v. Christie's Int'l PLC,

46

699 F.3d 141 (2d Cir. 2012) citing Rotella v. Wood, 528 U.S. 549 (2000).[22]  The four-year period begins to run "even where the full extent of the RICO scheme is not discovered until a later date[.]"  World Wrestling Entm't, Inc., 328 F. App'x at 697.  "[D]iscovery of the injury, not discovery of the other elements of a claim, is what starts the clock." Rotella, 528 U.S. at 555, 558 (limitation period commences "at the point of injury or its reasonable discovery").

PEMEX claims it was injured when it paid the allegedly fraudulent invoices between August 2000 and January 2002 and, as a result, purportedly made substantial overpayments on the Project.  (Am. Compl. ¶¶ 42-45, 57, 60)  Accordingly, PEMEX knew or should have known of its alleged injury no later than 2002 when the invoices had been paid, the Project was substantially complete, and the parties had initiated Arbitration over the invoices.

PEMEX's own allegations establish that *over ten years ago* the underlying invoices were subject to extensive internal and external auditing *and* PEMEX knew it did not want to pay them.  Indeed, PEMEX alleges that "CONPROCA . . . did not provide evidentiary support" for the invoices submitted in 2000.  (Am. Compl. ¶ 21)  PEMEX also concedes that in 2000 "CICATA-IPN," an independent "private entity related to Mexico's Department of Public Administration," was brought in to audit and review CONPROCA's invoices and issued a written report specifically "conclud[ing] that PREF should not pay CONPROCA any additional monies because these payments were not authorized under the original Contract and, even if authorized, were not adequately documented or otherwise supported."  (Id. at ¶ 22)  Thereafter, the CICATA-IPN written report was reviewed by both PREF's internal control department and by PEMEX's "Technical Committee." (Id. at ¶¶ 23-24)

---

[22]  The statute of limitations for a civil RICO conspiracy claim likewise is four years.  World Wrestling Entm't, Inc. v. Jakks Pac., Inc., 530 F. Supp. 2d 486, 524-25 (S.D.N.Y. 2007), aff'd, 328 F. App'x 695 (2d Cir. 2009).

As such, PEMEX discovered or should have discovered its supposed injury, and the four year-statute of limitations began to run, by no later than 2002.  PEMEX pleads no facts that might provide a basis for reviving decade-old allegations as to which the four-year RICO statute of limitations has long since run, and the RICO claims, therefore, must be dismissed.

### B.   THE FRAUD CLAIM ALSO IS TIME-BARRED

"Under New York law, the time within which an action based upon fraud must be commenced is 'the greater of six years from the date the cause of action accrued or two years from the time the plaintiff … discovered the fraud, or could with reasonable diligence have discovered it.'" Koch, 699 F.3d at 154 (2d Cir. 2012) (quoting N.Y. C.P.L.R. 213(8)).  In addition, "New York law recognizes, as RICO law does, that a plaintiff may be put on inquiry notice, which can trigger the running of the statute of limitations if the plaintiff does not pursue a reasonable investigation." Id. at 155-56.  Thus, "it is proper under New York law to dismiss a fraud claim on a motion to dismiss pursuant to the two-year discovery rule when the alleged facts do establish that a duty of inquiry existed and that an inquiry was not pursued." Id. at 155-56 (internal citations omitted).

PEMEX's fraud claim relies on the same allegations as PEMEX's RICO claim.  For the reasons discussed above, PEMEX knew or should have known of the allegedly fraudulent invoices by 2002 (indeed, even the 2008 SEC Complaint and PEMEX's investigation based thereon occurred well over two years ago).  Accordingly, PEMEX's fraud claim is time-barred.

48

**CONCLUSION**

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.


Dated:  New York, New York
        May 24, 2013

                                    WHITE & CASE LLP

                                    By:   /s/ David G. Hille
                                          David G. Hille (DH9865)
                                          Owen C. Pell (OP0118)
                                          Robert E. Tiedemann (RT6126)
                                          Melissa M. Laferriere (ML1010)

                                    1155 Avenue of the Americas
                                    New York, New York 10036
                                    Phone: (212) 819-8200
                                    Facsimile: (212) 354-8113

                                    K&L GATES LLP

                                    By:   /s/ Laura A. Brevetti
                                          Laura A. Brevetti (LB8935)
                                          Brian D. Koosed (BK5067)

                                    599 Lexington Avenue
                                    New York, New York 10022
                                    Phone: (212) 536-3900
                                    Facsimile: (212) 536-3901

                                    Attorneys for Defendant
                                    SK ENGINEERING &
                                    CONSTRUCTION CO., LTD.

NEWYORK 8856530