⌐⌐ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/30/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - X
PETRÓLEOS MEXICANOS AND PEMEX-
REFINANCIÓN,

                    Plaintiffs,

          - against -

SK ENGINEERING & CONSTRUCTION CO. LTD.,
and SIEMENS AKTIENGESELLSCHAFT,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - X

12 Civ. 9070 (LLS)

MEMORANDUM AND ORDER

     Defendants SK Engineering & Construction Co. Ltd. ("SKEC"), a Korean engineering conglomerate, and Siemens Aktiengesellschaft ("Siemens"), a German engineering conglomerate, move to dismiss the Amended Complaint of plaintiffs Petróleos Mexicanos, Mexico's national oil exploration corporation, and its subsidiary Pemex-Refinanción (collectively, "PEMEX").

     The Amended Complaint alleges the defendants violated the Racketeering Influenced Organizations Act ("RICO"), 18 U.S.C. § 1962, and common-law fraud, by bribing PEMEX officials to approve overrun and expense payments to CONPROCA, S.A. de C.V. ("CONPROCA"), a Mexican corporation completing an oil refinery rehabilitation project in Cadereyta Jiminez, Nuevo Leon, Mexico ("the Cadereyta Project").

1

Because the plaintiffs fail to state a domestic RICO claim under Fed. R. Civ. P. 12(b)(6), the Amended Complaint is dismissed.

1.

The alleged scheme to defraud PEMEX, the Mexican plaintiff, arises out of the defendants' management and operation of CONPROCA, the Mexican corporation.

The defendants formed CONPROCA to bid on a contract to improve and expand the Cadereyta oil refinery.  In 1997, PEMEX awarded CONPROCA the contract, based on a bid which PEMEX claims deliberately understated the true cost of the project.

The agreement between PEMEX and CONPROCA consisted of two contracts, each signed in 1997 in Mexico City, and one of which provided that CONPROCA "would receive payment for work orders required by unexpected events," Am. Compl. ¶ 19, from PEMEX's Project Funding Master Trust (the "Master Trust").

The Master Trust, organized under Delaware law and managed by its then-trustee Bank of New York, was established "to facilitate the financing" of long-term public works projects in Mexico by providing, among other functions, "payments to vendors and service providers."  Id. ¶ 33.  "PEMEX was the sole beneficiary of the Trust and controlled all of its activities."  Id. ¶ 32.

2

The agreement "was conditioned to [sic] CONPROCA obtaining financing." Id. ¶ 37.  CONPROCA financed the project "through the issuance of bonds registered with the SEC, and through institutional credit, a substantial amount of which were [sic] issued by U.S. financial institutions and guaranteed by the Export-Import Bank of the United States," id. ¶ 18.

Over the course of completing the work in Cadereyta, disputes arose over construction delays, cost overruns, and the payment of expenses.  From July 7, 2000 to January 8, 2001, CONPROCA and Pemex-Refinanción entered into a series of additional agreements (the "Additional Agreements") in which PEMEX extended construction deadlines, preapproved claims for overruns and expenses, and allowed CONPROCA to submit additional claims to be paid upon PEMEX's further approval.

CONPROCA issued seven invoices under the Additional Agreements totaling over $159 million.  Id. ¶ 40.  SKEC "approved the invoices," and Siemens "caused the invoices to be transmitted to PEMEX."  Id. ¶ 57.  Upon "receipt by PEMEX of invoices under the project contracts, PEMEX would transmit a Designated Obligation Payment Instruction ('DOPI'), attaching each invoice, by fax, to the Master Trust instructing it to make payment to CONPROCA."  Id. ¶ 36.  The Master Trust paid each invoiced amount from its New York account to CONPROCA's account at Citibank in New York.

PEMEX claims that "corrupt payments allowed Defendants to secure" the Additional Agreements, id. ¶ 39, and "facilitated the preparation, approval, and processing" of several invoices for "manufactured cost overruns," id. ¶ 40.   It alleges that Siemens transferred $2.6 million to Siemens' business consultant Jaime Federico Said Camil Garza, who "managed" the defendants' illicit "enterprise by funneling the bribes to officials at PEMEX," id. ¶ 57.

Although PEMEX does not identify the recipients of the bribes, it names several PEMEX officials as the defendants' co-conspirators, alleging that the officials signed "the agreements that caused Plaintiffs to be defrauded," "authorized the payment of invoices that caused Plaintiffs to be defrauded," and "prevented PEMEX from cashing several letters of credit" payable by CONPROCA.  Id. ¶ 57.

To obtain civil remedies under RICO, a plaintiff must establish that "he was injured in his business or property by reason of a violation of" 18 U.S.C. § 1962, because

> (1) that the defendant (2) through the commission of
> two or more acts (3) constituting a "pattern" (4) of
> "racketeering activity" (5) directly or indirectly
> invests in, or maintains an interest in, or
> participates in (6) an "enterprise" (7) the activities
> of which affect interstate or foreign commerce.

Moss v. Morgan Stanley Inc., 719 F.2d 5, 17 (2d Cir. 1983).

4

PEMEX alleges it was injured by the defendants' conspiracy to participate, and participation, in two RICO enterprises:

(a) CONPROCA (a Mexican corporation), and

(b) the association of the individual named officials of PEMEX (the Mexican plaintiff), defendant Siemens and one of its consultants (a German corporation and a Mexican consultant), and defendant SKEC (a Korean corporation),

through a pattern of racketeering activity comprised of the following acts of wire fraud: the defendants

(a) transmitted "through the wires, specifically, through fax from New York" CONPROCA's (a Mexican corporation's) "Financial Plan to PEMEX" (the Mexican plaintiff),

(b) caused the seven invoices "to be transmitted by CONPROCA through the wires to the Master Trust through PEMEX," and

(c) "paid bribes to PEMEX officials,"

in furtherance of their scheme to deprive "PEMEX of the intangible right of those officials' honest services" and receive unearned overrun and expense payments "for the purpose of making up the financial shortfall incurred by submitting an economically unrealistic bid." Am. Compl. ¶ 61.

5

2.

The defendants argue that the RICO claims are extraterritorial and must therefore be dismissed.

"When a statute gives no clear indication of an extraterritorial application, it has none." Morrison v. Nat'l Australia Bank Ltd., 130 S. Ct. 2869, 2878 (2010). Because "RICO is silent as to any extraterritorial application," Norex Petroleum Ltd. v. Access Indus., Inc., 631 F.3d 29, 32 (2d Cir. 2010) (internal quotation marks omitted), "The RICO statutes do not apply extraterritorially." Republic of Iraq v. ABB AG, 08 Civ. 5951 (SHS), 2013 WL 441959, at *20 (S.D.N.Y. Feb. 6, 2013).

Under Morrison, to determine "whether a complaint alleges a claim within a statute's domestic ambit, courts should consider if the alleged conduct in or contact with the United States is within the statute's 'focus,' meaning 'the object' of the statute's 'solicitude' or what the 'statute seeks to regulate.'" Cedeno v. Castillo, 457 F. App'x 35, 37 (2d Cir. 2012) (quoting Morrison, 130 S. Ct. at 2884) (brackets omitted). Thus, "When foreign actors were the primary operators, victims, and structure of a RICO claim, courts in this Circuit have properly concluded that the claims were extra-territorial." Republic of Iraq, 2013 WL 441959, at *24.

The RICO claims here are extraterritorial: they allege a foreign conspiracy against a foreign victim conducted by foreign defendants participating in foreign enterprises.

The Amended Complaint states that the German and Korean defendants used the alleged RICO enterprise CONPROCA (a Mexican corporation) to defraud PEMEX, an instrumentality of the Mexican government, by bribing officials in Mexico (members of a second alleged RICO enterprise) to approve agreements entered into in Mexico and pay claims for costs and expenses incurred on a massive Mexican public works project.

The plaintiffs argue their claims are domestic because of the involvement of U.S. entities in the financing of the project, because CONPROCA faxed its financing plan to PEMEX from New York, see Am. Compl. ¶ 61, and because the fraudulent invoices

> were directed from Mexico to PEMEX's Master Trust in New York; the Master Trust was bound to pay the invoices as a result of standing instructions issued in conjunction with the Trust's formation; the payments were approved by the Trustee in the United States; and the payments were transferred to Defendants' account, also in the United States.

Pls.' Opp. at p. 11.

Plaintiffs claim those domestic contacts were "central" to the defendants' fraudulent scheme and demonstrate that "the RICO 'pattern of racketeering activity' takes place in the United States." Id. at p. 8.

On the contrary, they fail to shift the weight of the fraudulent scheme away from Mexico. Seen simply, as a result of the claimed conspiracy PEMEX, the Mexican plaintiff for whom the work was done in Mexico, paid fraudulent overcharges to CONPROCA, the Mexican corporation which did the work.

PEMEX officials in Mexico granted the challenged approvals to pay CONPROCA. The American trustee merely transferred the payments through two banks in New York. See Am. Compl. ¶ 37 (PEMEX "controlled all" of the trust's activities); Pls.' Opp. at p. 11 (the trust was "bound to pay the invoices").

The defendants' bribery of PEMEX officials, and CONPROCA's underbidding and submitting false claims under the Mexican public works contracts, all occurred in Mexico. Thus, "it is implausible to accept that the thrust of the pattern of racketeering activity was directed at" the United States, Republic of Iraq, 2013 WL 441959, at *23.

The RICO claims are accordingly dismissed.

3.

The Court declines to exercise supplemental jurisdiction over plaintiffs' remaining claim for common-law fraud. See 28 U.S.C. § 1367(c)(3).

8

## CONCLUSION

Defendants' motions (Dkt. Nos. 35 and 41) are therefore granted, and the Amended Complaint is dismissed.

The clerk is directed to enter judgment accordingly.

Dated: New York, New York
      July 29, 2013

                                                     LOUIS L. STANTON
                                                        U.S.D.J.